**William H. HINOTE and Barbara A. Hinote, Appellants,**

v.

**OIL, CHEMICAL AND ATOMIC WORKERS INTERNATIONAL UNION, AFL–CIO, LOCAL 4–23, et al., Appellees.**

**No. C14–88–132–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

July 20, 1989.

Rehearing Denied Aug. 24, 1989.

James L. Weber, Beaumont, for appellants.

Thomas J. Swearingen, Port Arthur, James E. Crouch, Hamilton, Stephen N. Williams, Beaumont, M. Diane Dwight, Port Arthur, for appellees.

Before PAUL PRESSLER, ROBERTSON and ELLIS, JJ.

## OPINION

PAUL PRESSLER, Justice.

Appellants were awarded $397,000 in actual and $785,000 in exemplary damages for injuries received during a bitter labor dispute in Jefferson County, Texas. The trial court overturned the jury verdict and granted judgment non obstante veredicto in favor of appellee. We reverse and render.

The review of a judgment n.o.v. is the same as that of a challenge to the legal sufficiency of the evidence. *Aero Energy, Inc. v. Circle C. Drilling Company*, 669 S.W.2d 821 (Tex.1985). In granting the judgment n.o.v. the trial court held that the evidence was legally insufficient to uphold the jury verdict. To uphold this order of the trial court, it must be found that there is no evidence to support the jury verdict. TEX.R.CIV.P. 301 states as follows:

Provided, that upon motion and reasonable notice the court may render judgment non obstante veredicto if a directed verdict would have been proper, and provided further that the court may, upon like motion and notice, disregard any jury finding on a question that has no support in the evidence.

The Texas Supreme Court has expressed this as follows:

To sustain the action of the trial court in granting respondent's motion for judgment not withstanding the verdict, it must be determined that there is no evidence to support the jury findings. In making this determination we must review the record in the light most favorable to the jury findings considering only the evidence and inferences which support them and rejecting the evidence and inferences contrary to the findings.

*Williams v. Bennett*, 610 S.W.2d 144 (Tex. 1980); *Citing, Dodd v. Texas Farm Products Co.*, 576 S.W.2d 812 (Tex.1979); *Douglass v. Panama Inc.*, 504 S.W.2d 776 (Tex. 1974); *See also, Navarette v. Temple Independent School District*, 706 S.W.2d 308 (Tex.1986).

Several of the individual appellees were elected officers in the Amdel, Inc. group of Local 4–23. These appellees were:

1) L.M. "Max" Hildabridle; 1st Vice Chairman and Alternate in the Safety Committee.
2) Robert Page; Intermediate Steward.
3) Glenn Gonsoulin; Departmental Steward.
4) Ray Lynch; Chaplain.

It is not clear from the record whether or not the other three individual appellees held official positions in the Union.

The evidence, in the light most favorable to the verdict, is as follows: On January 7, 1982 the Amdel, Inc. group (The American Petrofina Refinery Employees) of Local 4–23, a division of the Oil, Chemical and Atomic Workers Union (O.C.A.W.), AFL–CIO, voted to strike. The labor contract expired at midnight and a work stoppage began at that time. At issue was the refinery's ability to determine how many men were needed to do a particular job. The refinery was concerned with productivity and a more efficient utilization of manpower. The Union was concerned that this might cause layoffs. At that time the security guards were no longer represented by the O.C.A.W. and did not participate in the work stoppage. Most of the guards were reassigned to prevent them from be-

ing in the middle of the dispute when they were friends of some of those involved. Guards from other Fina refineries were brought in for security.

On September 22, 1982, almost ten months after the strike began, appellant, William H. Hinote, crossed the picket line. Mr. Hinote testified that he felt the Union was not working to resolve the strike. The day he returned, Mrs. Hinote received a telephone call at home. The voice stated, "Tell Bill we will get him.", and, "you had better watch your little girl." (Emphasis added). Similar calls were received at the store where Mrs. Hinote was employed.

On September 23, Mr. Hinote returned to work. A dummy, wearing clothes identical to those which Mr. Hinote had worn the day before, was hung from a hangman's noose on the gate. The sign on the dummy read "This is what we do to scabs." (Emphasis added). On September 26th the Hinote home was bombarded with small rocks and ballbearings. On September 29th Mr. Hinote's daughter found a large weight, like one used to weight large curtains, in their driveway. This type of weight is called a "dead man." Mr. Hinote was also followed home on numerous occasions.

On October 2nd, Mr. Hinote left his house to go to work. As he approached his car, he was shot five times with a .22 caliber rifle. Mr. Hinote was struck twice in the right leg, once in the left knee, once in the abdomen and once in the hand. Mr. Hinote was able to crawl back to the house. An ambulance, the police and the refinery were called. The bullets were removed at Mid–County Hospital, and Mr. Hinote was placed in intensive care. He was released from the hospital approximately two weeks later.

The appellants' first witness was William R. Crabtree, the personnel-employee relations manager at the Refinery. He testified that every work stoppage in the Port Arthur area with which he was familiar was accompanied by some type of violent activity. The violence which accompanied this work stoppage began on February 1, 1982, when the window of a security vehicle was shot out. On February 4th, a guardhouse was hit by three or four bullets from a weapon which fired thirty-thirty rounds. Three people were inside the guardhouse, but none was injured. The tires of several vehicles were slashed that same night. There were no pickets in the area at that time, but Mr. Crabtree testified that the acts of violence generally do not occur on the picket line. He stated that the acts usually occurred while employees were going to and from work, at the employees' homes and around the plant's perimeter. The gates at the plant had been equipped with video cameras which taped continuously.

On February 20, appellee Leo M. "Max" Hildabridle was involved in an altercation with a security guard. He and others had been throwing rocks at the guardhouse. The security guard, Tommy King, left the guardhouse to investigate the matter when Hildabridle threatened him with a knife. The police were called and spoke with Mr. Hildabridle. After the police officers had left, Roland Mendoza, a regular Fina security guard, went out to talk with Mr. Hildabridle. The taped conversation was played for the jury. It went, in part, as follows:

King: It's them right there, isn't it?

Mendoza: That's Corville and that's Max on the left.

King: Okay. Huh? There's another one. Want me to go with you?

Mendoza: Nah.

Mendoza: All right. (unintelligible)

Max: Call the f____' law, Roland, on a g__d__ threat with a knife.

Mendoza: Yeah. I can't ...

Max: Mother f____, I could've cut your g__d__ throat if I'd wanted to do that. You was close enough

Mendoza: I know you were close.

Max: I'm a little loud mouth, but not f____ physically radical.

Mendoza: Well, Max, you know ...

Max: I don't appreciate that s____, Roland.

Mendoza: Well, Max, I don't want no hostility out here and I ...

Max: I don't want no hostility either. Don't bring that scabby mother f____

with you when you come. You want to talk to me, come by yourself.

Mendoza: Look, Chester had called me.

Max: F___ Chester.

Mendoza: So I had come down here and I didn't know if there was a problem.

Max: Roland, I do not want to see you out here.

Mendoza: Well, Max, I, I come for the picket line. No. It was a picket line that called me. I wasn't out here for trouble. Just like I told you, I come out here just to talk.

Max: You go a f___' sergeant, a g__d__ detective and f___' no account down here. They got my f___' name, which they already had because you know who I am.

Mendoza: Yah, I do.

Max: I'm standing here cleaning my g__d__ finger nails and you get your finger pointed. If I'd wanted to stick you, Roland, I'd a stuck you. I don't want to stick you. I'd like to stick the mother f___ that was standing next to you.

Mendoza: Okay, well, Max

Max: Don't do that s__ to me no more, Roland.

Mendoza: I took it as a threat. Don't threaten me.

Max: It ain't no f___' threat. If I threaten you, I'll drag your a__ out here in the f___' street and I'll kick your g__d__ a__' cause I think I'm capable of it.

Mendoza: Well

Max: and this big mother f___' next to you, don't bring this son of a b__ out here no more. If you want to come out here and shoot the s__ and be a nice guy

Mendoza: Now wait a minute

Max: Come by yourself, Roland.

•    •    •    •    •

Max: I don't want to see them son of a b___, Roland.

Mendoza: Okay. Okay. I didn't mean no harm, I come out here just to talk.

Max: I will cut his mother f___ in half.

Mendoza: Okay, okay. I just come out here to be friends.

Max: I'd love him to walk in the street.

Mendoza: I don't have no hard feelings for you, Max, not whatsoever.

•    •    •    •    •

Max: And don't bring that scabby son of a b__ with you.

Mendoza: He ain't supposed to come on the line.

Max: Well, keep him out of here, Roland.

Mendoza: Well, okay, okay.

Max: I don't need this s___. Now the f___' law's got my name, my phone number and my address which they had to start with 'cause you done told them who I was. They asked me, there was no point in my lying, so I told them. I had the f___' sergeant, I done p___ him off.

Mendoza: Oh my gosh.

Max: I said, "What the f___ you doin' down here, we don't need your g__d__ a__." He's got the red a__. He said, "I can take you to jail." I know you can. That's the beside—I don't need to see that ugly b___.

Mendoza: Okay. I just try to make peace, Max, I don't come out here to stir—I was willing to walk off if it irritated you me being here, but I was tryin' to find out

Max: Roland, I am (unintelligible) the red a__.

Mendoza: All sides of the story before I, I

Max: Queers like that the red a__. **I'm gonna try to. If I can antagonize them, that's good, that's what I'm here for.**

Mendoza: Okay, okay. Good night, Max.

Max: Between you and I

Mendoza: Okay, Max.

Max: That's all right.

Mendoza: Okay.

Max: Don't bring that f___' faggot out here.

Mendoza: Good night.

(Emphasis added). Not long after this altercation Mr. Hildabridle was elected Vice-Chairman of the Amdel, Inc. group of

Local 4–23. The Vice–Chairman is the second highest position in the Amdel, Inc. division of the union.

Appellee, Max Hildabridle, testified, that at times his purpose was to intimidate and antagonize, just as he had done in his conversation with Roland Mendoza. Mr. Hildabridle stated that Mr. Hinote was a "scab" and that "scabs fire him up." After he was fired by Fina because of the Mendoza incident, he was paid by the Union from February of 1983 through December of 1986. The Union also voted to increase dues by five dollars a month for Mr. Hildabridle's defense fund. The Union negotiated with the company for amnesty for all the people who had been involved in strike related violence, including Mr. Hildabridle, as part of the contract settling the strike. The company refused. The Union then sued the company for firing Mr. Hildabridle and paid him $39,000 while the case was pending.

Tacks were strewn on the pavement at the gates of the refinery at least sixteen times during the strike. Numerous incidents at the gate were video taped. On one occasion appellee Ray Lynch, the union's chaplain, was taped throwing nails or tacks in front of the gate. On another occasion a union member was taped slashing a tire. During a mass picket, beer was thrown at persons entering and exiting the refinery. Mr. Crabtree blamed the continuous violence on the union. He stated, "Had there been a significant effort, it [the violence] wouldn't have continually occurred." On July 20, 1982 the window of a replacement worker's car was broken by bricks while he was staying in a company apartment.

The first person to cross the picket line was Mr. Carroll Corbello. Mr. Corbello was still a probationary employee since employees who have worked at the refinery less than six months cannot become a member of the union. This was the first time anyone had ever crossed a picket line at the Fina refinery. Before crossing, Corbello met with Mr. Crabtree. Mr. Crabtree warned him that he would be subjected to threats, coercion and intimidation for crossing the picket line.

Corbello crossed the picket line on June 1, 1982. Immediately after that, tension and intimidation increased. He testified that the next day he and his wife started receiving harassing telephone calls. He was followed home two or three times a week. Sometime in July, two vehicles followed Mr. Corbello home. When he reached his house, the vehicles turned around and stopped at the end of his driveway. One of the men told him that he was not helping the union's cause and that if he caught Corbello in town he would, "slit his [Corbello's] throat to his spine." Mr. Corbello's wife had come out of the house by then and stood behind him. She also testified about the conversation. The man in the car was identified as Max Hildabridle. This is the same threat Mr. Hildabridle made to Mr. Mendoza when he said "I will cut his [King] mother f____ in half … I'd love him to walk the streets." In addition to this threat, Mr. Corbello's tires were slashed and his car's rear window was broken with a brick. The windows of his house also were broken.

Appellee Ray Lynch, the union chaplain, wrote a letter to a newspaper regarding the strike after Mr. Hinote was shot. His letter stated in part as follows:

> As for Hinote; he hired in at the refinery the same year I did twenty-four years ago. I never considered him an arm licker even though he rarely participated in union activities and I was quite surprised and even shocked to learn that he was crossing the picket line. I don't believe it was a union man who shot him in the butt even though there are a lot of us who would like to have done it for good reasons because of what he did by crossing his own picket line.

This letter was admitted into evidence and read to the jury.

Emery Fontenot crossed the picket line on September 20, 1982. Fontenot testified that approximately fifteen members of the union were responsible for the violence and that some of those fifteen were leaders or officers in the union. Mr. Fontenot's fa-

ther was a retired Fina employee. When Fontenot told his father of his decision to cross the picket line, his father cried being concerned for the welfare of Mr. Fontenot's children. Mr. Fontenot discussed the problem other people had had in previous years after they crossed the picket line at other refineries.

Mr. Fontenot was also followed home by appellees Don Gribnau, Lee Soliz and other union members on many occasions. Mr. Fontenot testified that in his opinion the strike was being handled "irresponsibly by irresponsible people" and that people were being "intimidated" into following the union representatives in charge of the negotiations. Mr. Fontenot further testified regarding a conversation he had had with appellee Lee Soliz as follows:

A I said, too bad Bill Hinote didn't have a chance to use a gun. And he was rather uncommittal about the Hinote shooting. He never would acknowledge that it was done by the Union membership.

Q Deny it?

A Well, he didn't. He couldn't tell me who shot him. He just said, "there is no way of knowing that it was somebody in the local that shot him." I said, "Well, maybe not, because we can't say who did it, but we know right now, both of us standing here, **that it was and why it was done to prevent other people from crossing the picket line and returning to work." He said, "Well, you possibly could be right about that. That's a possibility."** (Emphasis added).

Mrs. Diane Fontenot also testified. She stated that she received constant threatening telephone calls. She identified one of the callers as appellee Don Gribnau and, on one occasion, the caller stated, "that my husband was going to be a dead man." The company switchboard received a call stating, "Fontenot is next."

Mr. Jimmy Whitley, also a Union member, testified that on Sunday, September 26, 1982 he was on picket duty. Sometime after eight p.m. appellees John Cross, Robert Page, Glenn Gonsoulin and Lee Soliz, together with Bert Latimer, showed up at the picket line unexpectedly. They talked to the three scheduled picketers about Mr. Hinote's crossing the picket line when Mr. Gonsoulin stated: "Something is going to happen to him [Hinote]." About four or five minutes later, the group left. Not long after they left, the Hinote's home was struck with rocks and ballbearings. Mr. Whitley also testified that it was his impression that these men would be the type who would break Mr. Hinote's windows or beat him up.

Gerald Neeb, a Union member, testified that he was at the Union hall the evening before Mr. Hinote was shot. He went into the Picket Captain's room to pick up his strike check and heard Mr. Hinote's name mentioned. Neeb's testimony regarding the conversation was as follows:

A I heard someone say they couldn't understand why nothing had happened to Hinote yet.

Q Okay. So this group of folks was concerned, or at least said they couldn't understand why nothing had happened to Hinote. Did you hear Mr. Gonsoulin make a comment?

A After I had spoken to Grado a little while, yes.

Q He said what?

A He said—I said something about I had the red a__. He said, "You think you have the red a__. I have it bad. Something is going to happen tonight."

Q Glenn Gonsoulin said, "Something is going to happen tonight?"

A Yes sir.

Mr. Hinote was shot the next morning.

Mr. Gonsoulin also testified. He never denied making the statements although he said he could not remember. According to his testimony, he and appellees Page, Soliz and Cross were at a bar called The Silver Spur from seven to eleven p.m. on September 26, 1982. To the contrary, the picket log showed that Mr. Page and someone else were at the picket line at nine o'clock p.m. on September 26.

On the morning Mr. Hinote was shot, Mr. Gonsoulin went hunting with another Union member, Joe Cowart. He testified that he drove right by Mr. Hinote's home dressed in camouflage clothes and armed with guns. No one could verify the time they arrived at their destination.

After the shooting, Mrs. Hinote continued to receive harassing phone calls. These calls were traced to the residence of appellee Don Gribnau. Gribnau's car was also witnessed driving by the Hinote's home on numerous occasions. On one occasion he called one of the security guards at the Hinote home a derogatory name.

Ms. Gwen Bruno worked with Mrs. Hinote at the store. She testified that she received a call intended for Mrs. Hinote after Mr. Hinote had been shot. The caller stated, "We didn't do a very good job on your husband, but we will make sure you are next." (Emphasis added) She also testified that the caller was very abusive and used the phrase "Yellow scabby mother f____" several times. She listened to the tape of the conversation between Max Hildabridle and Roland Mendoza and identified the voice of the caller as that of Max Hildabridle.

In November 1982, eleven months after the strike began, the work stoppage ended. The Union brought charges against Mr. Hinote for crossing the picket line, and he was kicked out of the Union.

There is an abundance of evidence to support the jury's entire verdict. In special issue No. 6, the jury found that the O.C.A.W. Local 4-23 was negligent in its failure "to discipline its members and take action to deter violence or properly control or manage the strike related activity during the work stoppage." Mr. Crabtree's testimony supports this finding.

The same acts that were directed against Carroll Corbello were directed against Mr. and Mrs. Hinote. The evidence demonstrated that each of the seven appellees were continually involved in the violence surrounding the strike. The conspiracy theory is supported by the fact that the telephone callers continually referred to themselves as "we." The appellees were also viewed in groups. Appellees Gonsoulin, Page, Soliz and Cross were together the night that the Hinote home was bombarded with rocks. On September 30, two days prior to Mr. Hinote's being gunned down, there was an incident when a .22 caliber weapon was fired outside the plant. This was the same type of gun used to shoot Mr. Hinote. This incident is reported in the same security report as the Hinote shooting.

It is also apparent that the Union ratified the violent acts. Ratification was defined in the charge as follows:

"RATIFICATION" means the adoption, confirmation or failure to repudiate prior unlawful acts which were not legally binding at a time when the Union had the right and knowledge of facts necessary to repudiate such conduct; but which, by ratification or by the failure to repudiate, become the acts of the defendant Union."

The Union was aware of the acts of Mr. Hildabridle. In spite of this, he was elected Vice Chairman of the Union. The Union also failed to take any action to discipline the members whom they knew were perpetrating the violence. The Union negotiated to grant them amnesty. The letter written by Mr. Lynch, the Union chaplain, indicated the Union's approval of the shooting. Mr. Hinote was kicked out of the Union after the shooting. On the other hand, the Union continued to support Mr. Hildabridle despite his continued violent behavior. TEX.REV.CIV.STAT.ANN. articles 5207a and 5154a address the right to work in Texas. Article 5207a, § 1 provides:

The inherent right of a person to work and bargain freely with his employer ... shall not be denied or infringed by law, **or by any organization of whatever nature.** (Emphasis added).

Article 5154a, § 1 provides, in part, as follows:

The working man, Unionist or non-Unionist, must be protected. **The right to work is the right to live.** (Emphasis added).

It is obvious that the jury found that the Union ratified these violent incidents, including the shooting, and was thus as re-

sponsible for them as were the individual appellees. These acts not only violated Mr. Hinote's right to work, but also almost violated his right to live.

In *Vasquez v. Bannworths, Inc.,* 707 S.W.2d 886 (Tex.1986), the Texas Supreme Court addressed Art. 5154 and the Right to Work statute. Mrs. Vasquez was found, by a jury, to have been fired because of her union membership. The court found the purpose of the statute to be as follows:

Those policies are to prevent unlawful retaliation and discrimination because of membership or non-membership in a union, and to protect employees in the exercise of their right of free choice to join or not join a labor union. *Vasquez,* 707 S.W.2d at 888.

Consequently, a company could not prevent an employee from working because of her union membership. This same principle should be applied to the unions. It would be inconsistent to hold an employer liable for discharging an employee because of union membership and not hold a Union liable for physically and mentally preventing an employee who crosses a picket line from working. The jury was also instructed that the Union was an unincorporated association. Therefore, the Union qualified as an organization under article 5207a. In Special Issue Number 1, the jury found that the Union and the individual appellees conspired to deny Mr. Hinote his "right to work." This was accomplished by causing him bodily injury.

Appellees claim that there is no cause of action in tort for a violation of the "right to work." TEX.REV.CIV.STAT.ANN. 5154g, § 4 states as follows:

Any person, organization or association who violates any of the provisions of this Act *shall be liable* to **the person suffering therefrom for** *all resulting damages* and the person subjected to strike or picketing in violation of this Act is given right of action to redress such wrong or damage, including injunctive relief, and the District Courts of this State shall grant injunctive relief when a violation of this Act is made to appear.

This was also addressed in *Vasquez* as follows:

Although a trial court may have some discretion in fashioning the relief to be granted by the injunction, we hold that article 5154g, section 4 limits that discretion by requiring that **the remedy devised be one which will undo the effects of violations of the Act....** As long as the relief sought is "fairly inferable" from the pleadings, **the court should design a remedy based on the relief sought, which will effectuate the policies of the Act.** (Emphasis added).

Appellants alleged this type of damages in their petition. The damages sought were consistent with *Vasquez.* They were such as would undo the effects of the violation and effectuate the policies of the Act. They sought recovery for the injuries received from a brutal shooting. The jury found the Union and the individual appellees prevented Mr. Hinote from working by causing him physical injury. The statute makes the violators of the Act liable for all resulting damages. Since physical injuries are involved, a tort action results. This effectuates the policies of the act by holding the Union and the individual appellees accountable for the damages they caused by violating Mr. Hinote's right to work.

Appellants also recovered for the intentional infliction of emotional distress and for assault. There is an abundance of evidence to support these claims such as the telephone calls, the use of sling shots, the breaking of the windows in the appellant's house, the hanging of a dummy, the throwing of the dead man weight and the shooting. Similar acts were directed against Mr. Corbello when he crossed the picket line. The correlation between the actions against the two clearly indicates that the Union and these individual appellees were responsible for these acts. There is evidence to support every finding made by the jury. Consequently, the trial court's order granting judgment n.o.v. must be overturned.

To grant judgment n.o.v., the trial court must find that there was no evidence

to support the verdict. Likewise when a "no evidence" point is sustained by an appellate court, it has a duty to render judgment in favor of the appellant. *Vista Chevrolet, Inc. v. Lewis,* 709 S.W.2d 176 (Tex.1986); *National Life and Accident Insurance Company v. Blagg,* 438 S.W.2d 905 (Tex.1969). Conversely, when the trial court made a "no evidence" finding to reject a jury's verdict and the appellate court finds evidence to support the verdict, judgment must be rendered in favor of the appellant. The granting of judgment n.o.v. is reversed, and the jury verdict is reinstated in full.

Appellees bring seventy-one cross points. They allege that the preponderance of the evidence standard was preempted here by the Norris LaGuardia Act (NLGA), 29 U.S.C. §§ 101 through 115 (1982). The NLGA § 106 states as follows:

> Responsibility of Officers and Members of Associations or their Organizations for Unlawful Acts of Individual Officers, Members and Agents.
>
> No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, **except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.**

(Emphasis added). This statute sets out three separate and independent ways the Union and its officials or members may be liable for unlawful acts as follows:

(1) Clear proof of actual participation in the unlawful act.

(2) Actual authorization of the unlawful acts.

(3) Ratification of the unlawful acts after actual knowledge of them.

■ Only the first of these requires a different standard of proof. The second and third do not require a higher standard. Proof of actual participation would almost always necessitate some type of tangible documentation. Ratification would require both knowledge of the event and a subsequent acquiescence or failure to repudiate. This higher standard need not be met if either the second or third test is met. The jury was instructed only on the third test, that of ratification. There is ample evidence to support the finding that the Union ratified or failed to repudiate the violent activities of its members. Therefore, it was proper to instruct the jury on the standard of the preponderance of the evidence.

■ Even if this were not the case, appellees' cross-points one through fifty, fifty-two through fifty-eight and sixty through sixty-seven would still be overruled because their objections to the charge were waived. Appellees' objections to the charge covered thirty pages of the record. They objected to every special issue, every instruction except one and the charge as a whole. They objected to every special issue on the grounds of factual insufficiency and that the issues were against the great weight and preponderance of the evidence. These objections are spurious and unfounded. Factual insufficiency of the evidence furnishes no basis for the refusal to submit an issue. *Strauss v. LaMark,* 366 S.W.2d 555 (Tex.1963); *Imperial Insurance Co. v. Ellington,* 498 S.W.2d 368 (Tex.Civ.App.—San Antonio 1973, no writ). TEX.R.CIV.P. 279 states as follows:

> A claim that the evidence was legally or factually insufficient to warrant the submission of any question may be made for **the first time after the verdict** ...

(Emphasis added). Other numerous invalid objections alleged that the issues were: (1) erroneous as a matter of law (without an explanation as to how or why they were erroneous); (2) requiring speculation; and (3) not responsive to the questions at issue. TEX.R.CIV.P. 274 provides in part:

> When the complaining parties objection, or requested question, definition, or instruction is, in the opinion of the appellate court, obscured or concealed by voluminous unfounded objections, minute differentiations or numerous unnecessary requests, **such objection or request**

**shall be untenable. No objection to one part of the charge may be adopted by a reference and applied to any other part of the charge by reference only.** (Emphasis added).

In *Clarostat Mfg., Inc. v. Alcor Aviation, Inc.*, 544 S.W.2d 788 (Tex.Civ.App.—San Antonio 1976, writ ref'd n.r.e.), the appellant made stock objections to the submission of special issues. The appellate court refused to consider any of the appellant's objections to the charge because rule 274 had been violated.

The appellees' objections on factual insufficiency were as follows:

MR. CROUCH: Special Issue No. 1: Defendants except and object to the submission of special issue number 1 to the jury for the reason that there is no evidence in this record of the deprivation of any right to work from Bill Hinote. Conversely, the evidence affirmatively shows by the testimony of Mr. Hinote that the only thing that he was deprived of was his ability to work by the injuries alleged to have been suffered by Mr. Hinote.

Further, there is insufficient evidence in this record to warrant the submission of special issue number one to the jury; and, further, that the submission of special issue number one is against the great weight and preponderance of the evidence.

THE COURT: Excuse me, Mr. Crouch. Now, your (sic) going to have that objection to everything?

MR. CROUCH: Can I object to all of them at one time?

THE COURT: Yes, A, B, and C and—

MR. CROUCH: Judge, **those are boiler plate objections and I am going to make them to all of them.** If the court will just let me do that at one time, I can skip a lot of this.

THE COURT: That's all right.

MR. CROUCH: All right.

(Emphasis added). It continued later:

MR. CROUCH: Your Honor, I would ask the court to take note that in each of these where there are multi-part answers like this, I am excepting and objecting to the lack of evidence and insufficiency of the evidence and against the greater weight and preponderance of the evidence as to each of these defendants as well, your honor.

THE COURT: I understand.

MR. CROUCH: If we could have that in here, I won't have to go through it.

THE COURT: All right.

An example of this objection to remaining special issues is as follows:

MR. CROUCH: Defendants except and object to the submission of special issue number four for the following reasons: **First, the running exception** and objection with respect to lack of evidence or insufficiency of evidence.

(Emphasis added). Not only did appellee object to every special issue on this basis, but also every sub-part of every special issue and for each of the eight defendants.

In *Smith v. Christley*, 755 S.W.2d 525 (Tex.App.—Houston [14th Dist.] 1988, writ denied), the appellant had objected on factual insufficiency grounds fifteen times on a thirty-three issue charge. My opinion held as follows:

"Appellant violated the rule [274] in two respects. First, his objections were too profuse. (Citations omitted) ... Second, he filled the record with spurious objections that could have never been sustained."

Appellees' objections here are even more profuse and spurious than those in *Smith*. They are almost too numerous to count. Applying them to each sub-part of every issue creates an impossible situation. The most spurious of all of the objections, factual insufficiency, was incorporated by reference through a "running" objection in violation of rule 274.

■ This case demonstrates the very purpose for which rule 274 was made. It was to protect the appellate court from having to waste judicial time by wading through countless spurious and unwarranted objections. This tactic of "shot gun" objections to the charge was the impetus for the adoption of rule 274 and the appellees' objections are a flagrant and extreme

violation of the rule. Cross-points one through fifty, fifty-two through fifty-eight and sixty through sixty-seven are waived and overruled.

◼ In cross-point number 51, appellees claim there is no evidence or, in the alternative, insufficient evidence to support the jury's finding of future medical costs. Dr. Mamoru Fukuda treated Mr. Hinote in the emergency room on the morning of the shooting. Dr. Fukuda removed the bullets, cleaned the wounds and placed Mr. Hinote in intensive care. After Mr. Hinote left the hospital, he continued to have problems with his left knee. The bullet had penetrated it, went through the knee joint and caused ligament damage. In April of 1986 Dr. Fukuda performed arthroscopic surgery on Mr. Hinote's left knee because of his continued problems. The doctor ascribed a 30 to 50 percent disability to the knee as a result of the shooting. Dr. Fukuda's testimony regarding future problems was as follows:

Q. We will come back and talk about that in a little bit. But in a nutshell, what had been the nature of his problem after the initial hospitalization and, hopefully, the healing of his injuries?

A. Well, after removal of foreign body, as far as I'm concerned, left knee is the most troublesome because of—he is starting degenerative changes of the left knee joint.

I did arthroscopic surgery. He made a good recovery. However this may cause trouble in the future. Otherwise, it appears to be okay.

Q. When you say 'may cause trouble in the future,' what do you mean by that?

A. Arthritis, getting worse.

Q. Does he have what we call "traumatic arthritis?"

A. Most likely, yes.

Q. Tell the jury what "traumatic arthritis" is.

A. Injuries to the articular surface of the joint which—causing arthritis.

Q. In your opinion, is that arthritis related to the gunshot wound?

A. To go back a little bit, now we are dealing just with the left knee; is that right?

A. Complaining part, yes, as far as I am concerned.

Q. After he got out of the hospital, he continued to have problems with the left knee; is that right?

A. No. He doesn't complain too much.

Q. When do your records note—

A. Records show up—he came back in '84.

Q. When?

A. February 28th, '84. Then he started complaining of pain, particularly squat and climb.

Q. You followed him regularly after that until you performed surgery in 1986; is that right?

A. Almost, yes. I was off sick in between time; yes.

Q. You were off sick for a period during there in which you referred him to Dr. Shuffield, I believe; is that right?

A. Yes, sir.

Q. With respect to his left knee, you said it might cause problems down the road. If he continues to have problems related to this gunshot would, what do you do next?

A. Probably end up total knee replacement.

Q. When you say a "total knee replacement," explain to the jury what that is.

A. It's like false teeth.

Q. I am sorry?

A. It's like false teeth.

Q. Is it like false teeth? Is that what you are saying?

A. False knee.

Q. You would just put in a false knee?

A. That's right.

Q. It is a plastic joint?

A. Make a plastic joint.

Q. Do we know how long something like that might last?

A. We don't know.

Q. Is that in itself a major surgical operation?

A. Yes, sir.

Q. How long does one have to be hospitalized to have a total knee replacement?

A. A week to a couple of weeks.

Q. What would the doctor's fees for such a thing be if you had to do it.

A. About $2,500.

This evidence is sufficient to support the finding of future medical costs. Appellees' fifty-first cross-point is overruled.

■ In their fifty-ninth cross-point, appellees claim that the punitive damage award which is against them individually is not supported by an actual damage finding because the actual damage questions do not apportion the damage amounts among the defendants. This basically is an objection to the charge. As set forth above, all cross-points regarding the charge have been waived. This point is also waived because the appellees failed to object to the charge on this ground or submit an issue on comparative causation. Absent such an issue, the actual damages are attributable to all the appellees since they were all found responsible for Mr. Hinote's injuries. Cross-point number fifty-nine is overruled.

In cross-points sixty-eight, sixty-nine and seventy, appellees claim the court erred in admitting or excluding certain items of evidence. Rulings on evidence during a trial are within the sound discretion of the trial court. An abuse of discretion is shown when the court's ruling was arbitrary or unreasonable to the extent that it was a clear and prejudicial error. To reverse on the basis of an abuse of discretion, it must be established that the facts permitted only one decision. *Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916 (Tex.1985).

■ Appellees contend the court erred in excluding evidence of Max Hildabridle's acquittal on criminal charges stemming from the King/Mendoza incident. Here, the evidence concerning the event was introduced to show the violent tendencies of the Union members during the strike and to illustrate that Mr. Hildabridle and the other appellees' purpose was "to harass and antagonize." The purpose was not to show that Mr. Hildabridle tried to injure Mr. King or that he committed a criminal offense.

There was no valid reason to admit evidence of the acquittal. *Britt v. Cambridge Mutual Fire Insurance Company,* 717 S.W.2d 476 (Tex.App.—San Antonio, 1986, writ refused n.r.e.). The decision to exclude the evidence was proper and not arbitrary or unreasonable. Cross-point number sixty-eight is overruled.

■ It is also contended that the trial court erred in admitting pieces of a .22 caliber rifle found by law enforcement officers. Appellees claim that there is no evidence which connects the weapon to Mr. Hinote's injuries. Mr. Calise Blanchard, the sheriff's deputy assigned the Hinote shooting, received information from crime stoppers that someone had knowledge of the gun used to shoot Mr. Hinote. The crime stoppers information led to the discovery of the .22 caliber rifle. The weapon found was of the type Officer Blanchard believed was used to shoot Mr. Hinote. This evidence was enough to connect the rifle to the shooting. Therefore, it was not unreasonable to admit such evidence. Cross-point number sixty-nine is overruled.

In cross point number seventy, appellees claim it was error to introduce the tape recording of the King/Mendoza incident. In *Seymour v. Gillespie,* 608 S.W.2d 897 (Tex.1980) the court held tape recordings admissible if the recording is a fair representation of the transaction. To determine whether the recording is a fair representation, the court set out seven elements which must be met. These elements are as follows:

(1) a showing that the recording device was capable of taking testimony; (2) a showing that the operator of the device was competent; (3) establishment of the authenticity of the correctness of the recording; (4) a showing that changes, additions, or deletions have not been made; (5) a showing of the manner of the preservation of the recording; (6) identification of the speakers; and (7) a showing that the testimony was voluntarily made without any kind of inducement.

The court addressed these elements as follows:

Some of these elements may be inferred and need not be shown in detail. For example, if a person hears and records a conversation or hears a conversation and a recording of the conversation, testified the recording is a fair representation, it can be inferred the recording device was capable of taking testimony and the operator was competent. The voluntary nature of the conversation may be inferred from the facts and circumstances of each case.

■ Mr. Mendoza testified that the tape was a true and correct recording of the conversation. Therefore, it can be inferred that the tape recorder was capable of taking testimony and Mr. Mendoza was competent to operate the recorder. The facts establish that Mr. Hildabridle was not induced to elicit any of the information contained in the recording. In fact, Mr. Hildabridle asked Mr. Mendoza to come out to the picket-line to talk to him. The voices were identified. The tape was transcribed at FINA and given to the police. The only change was a small blank portion which was accidently erased by the police. The rest of the tape is a complete record of the conversation. The requirements were met. Cross-point number seventy is overruled.

■ In cross-point number seventy-one, appellees claim the trial court which heard the first trial erred in granting the Hinotes' motion for new trial. We do not have jurisdiction to hear this point. In *Conley v. Pompa,* 627 S.W.2d 512 (Tex.App.—Corpus Christi 1982, no writ) the court was presented with an identical situation. In *Conley,* the plaintiff sued Dr. Conley for malpractice. In the first trial, the court found the answers to the special issues were conflicting and granted a new trial. The plaintiff obtained a favorable verdict in the second trial. The doctor appealed claiming error in the granting the new trial. The *Conley* court held as follows, "An order granting a new trial is an interlocutory order, and absent statutory authority [sic] this Court cannot act on such [sic] appeal." [citation omitted] *Conley* 627 S.W.2d at 513. The Supreme Court has also held that orders granting a new trial are not reviewable on appeal. *Cummins v.*

*Paisan Construction Co.,* 682 S.W.2d 235 (Tex.1984). Appellees' seventy-first cross-point is overruled.

The judgment is reversed and the jury verdict reinstated.

ELLIS, Justice, dissenting.

I respectfully dissent from the majority's opinion. In reviewing whether the trial court's judgment notwithstanding the verdict was proper, we must view the evidence admitted at trial in favor of appellants and determine that there is no evidence upon which the jury could have found for appellants. *Exxon Corp. v. Quinn,* 726 S.W.2d 17, 19 (Tex.1987). I would affirm the trial court's judgment because there is no evidence actually connecting Local 4–23 and the seven individual appellees to the acts complained of by the Hinotes. While proof of a conspiracy, in particular, may be made by circumstantial evidence, vital facts may not be proved by unreasonable inferences from other facts and circumstances nor may a vital fact be established by piling inference upon inference. *Schlumberger Well Surveying Corp. v. Nortex Oil and Gas Corp.,* 435 S.W.2d 854, 858 (Tex.1968).