United States Court of Appeals,

Fifth Circuit.

No. 92-4338.

Mildred PRUNTY, Plaintiff-Appellant.

v.

ARKANSAS FREIGHTWAYS, INC., and Chuck Baugh, Defendants-Appellees.

March 21, 1994.

Appeal from the United States District Court for the Eastern District of Texas.

Before JOHNSON, SMITH, and EMILIO M. GARZA, Circuit Judges.

JOHNSON, Circuit Judge:

The petition for rehearing is GRANTED. We withdraw our opinion of August 4, 1993, and substitute the following.

Mildred Prunty worked for Arkansas Freightways, Inc. ("AFI") from April 1987, until June 1, 1989. Throughout the last nine months of her employment with AFI, Mrs. Prunty was subjected to extreme and outrageous sexual harassment by her supervisor, Chuck Baugh. Mrs. Prunty brought this cause of action against AFI and Mr. Baugh,[1] alleging that both defendants were liable for intentional infliction of emotional distress and violations of Title VII[2] and the Texas Commission on Human Rights Act[3] ("article

_____

[1]The district court dismissed the claims against Mr. Baugh at trial because Mrs. Prunty had failed to serve Baugh with her complaint.

[2]42 U.S.C. § 2000e *et seq.*

[3]TEX.REV.CIV.STAT.ANN. art. 5221k (Vernon 1987 and Vernon Supp.1992).

5221k").  Although the district court found that Mrs. Prunty had suffered severe emotional distress at the hands of Mr. Baugh, it held that AFI was not liable for the damages which flowed therefrom.  The court also found that AFI was responsible for the sexual harassment of Mrs. Prunty, having violated Title VII.  However, the court held that neither Title VII nor article 5221k authorized the type of relief which Mrs. Prunty sought.  We affirm in part and reverse and remand in part.

## I. Facts and Procedural History

Arkansas Freightways, Inc. is a trucking company which has numerous terminals throughout several states, including Texas.  In 1987, AFI opened a terminal in Paris, Texas, and hired Mildred Prunty as a clerical worker for that terminal.  Mrs. Prunty had the responsibility, for the most part, of running the entire Paris operation.  Among other things, she interviewed applicants for truck-driver positions, made recommendations as to which applicants should be hired, dispatched drivers, ensured that the trucks were maintained, performed administrative functions, took care of customer service, and, if necessary, drove trucks.  On July 13, 1987, AFI promoted Mrs. Prunty to operations supervisor and made her a salaried employee.

From the beginning of her employment until as late as September 1988, Mrs. Prunty was supervised by Robert Smart, the terminal manager in charge of the Paris and Sherman terminals.[4]

---

[4]Mr. Smart worked out of the Sherman terminal and visited the Paris terminal just once per week.

2

AFI hired Chuck Baugh as the terminal manager for the Paris terminal in September 1988. Shortly after his arrival in Paris, Mr. Baugh began to daily make vulgar, offensive, and degrading comments about Mrs. Prunty both to Mrs. Prunty and to AFI truck drivers and dock workers.

Throughout this time, Mrs. Prunty communicated with Baugh's supervisor, Mr. O.D. Rippy. Mr. Rippy, the vice president of AFI's southwestern operations, worked in the Dallas office. Mrs. Prunty telephoned Mr. Rippy several times to discuss Baugh's unprofessional behavior. She also wrote a letter to Mr. Rippy to inform him of Baugh's abusive language and scurrilous remarks. She ended the letter by asking Rippy for help.[5] Mrs. Prunty's husband also telephoned Mr. Rippy to inform him of the abuse which Mrs. Prunty was experiencing. Mr. Prunty told Rippy about the remarks and gestures which Mr. Baugh had made to and about Mrs. Prunty and asked him to put an end to the situation. However, Mr. Rippy informed the Pruntys that Mr. Baugh and Mrs. Prunty would have to work out the problems themselves.

Receiving no help from Mr. Rippy, Mildred Prunty sent a letter through express mail to Mr. Sheridan Garrison, AFI's president. In this letter, she stated that Mr. Baugh had made rude and obscene comments to her and about her. As a result of this letter, Mr. Rippy, the vice president who had previously ignored Mr. and Mrs. Prunty's pleas for help, was ordered to investigate the Paris

[5]Mr. Rippy denies receiving this letter; however, the district court found that Mr. Rippy was aware of Mr. Baugh's conduct. AFI has not challenged this finding.

3

office to determine whether Mrs. Prunty's allegations were meritorious. Rippy then determined that the allegations were, indeed, legitimate. He had the workers at the Paris terminal to write down the types of statements which Baugh had made about Prunty. Mr. Rippy then faxed those statements to AFI's office in Arkansas. Chuck Baugh was promptly dismissed.

Because Rippy faxed the statements, additional AFI employees were able to view the vulgarities spoken by Mr. Baugh to and about Mrs. Prunty. Baugh's replacement, Scott Harris, was one of the Arkansas employees who read the statements. Mrs. Prunty testified that when she learned that Scott Harris knew about the obscenities uttered about her, she felt so humiliated and degraded that she could no longer work with or for him. Prunty therefore resigned her position as operations supervisor[6] and found employment in Dallas with the United States Postal Service.

Prunty brought this cause of action in Texas state court, and AFI removed it to federal court. After a bench trial, the district court found that Baugh's conduct was intentional, offensive, extreme, and outrageous; the court further held that Baugh's conduct created an abusive, hostile, and offensive working environment. The court decided that the sexual harassment was so

---

[6]She stated that she also resigned because she had not been promoted to the terminal manager position after AFI fired Baugh. However, the district court found that she never applied for the position, that she did not inform her superior officers that she was interested in the position, and that she was not qualified for the position. There was also evidence that Mrs. Prunty had informed her fellow workers that she would resign regardless of whether AFI offered her the terminal manager position.

4

pervasive that AFI was charged with constructive knowledge thereof. Further, finding that Mr. Rippy actually knew of the sexual harassment, the court found that Rippy had done nothing to remedy the problem prior to April 1989—when Prunty contacted AFI's president.[7]  The district court also determined that Mrs. Prunty had, indeed, suffered severe emotional distress as a result of Baugh's conduct and that Prunty had successfully established a Title VII claim against AFI.

However, the court went on to hold that Mrs. Prunty was not entitled to any relief.  Furthermore, the court decided that AFI could not be held liable for the intentional infliction of emotional distress because the court determined that Baugh had not acted within the course and scope of his employment.[8]  Finally, the court denied Mrs. Prunty's requests for compensatory and punitive damages under Title VII and article 5221k because it concluded that

---

[7]The court specifically determined:

> 11. Plaintiff complained to Mr. Baugh's supervisor, O.D. Rippy, about the working conditions at the Paris, Texas[,] terminal on several occasions.  Mr. Rippy was the Southwest Region Vice-President for defendant. Based on the credible evidence, the Court finds that Mr. Rippy was aware of the sexual harassment of plaintiff by Mr. Baugh.

> 12. Prior to April 1989, Mr. Rippy took no action to remedy the situation at the Paris Terminal.

> 13. In April 1989, plaintiff contacted defendant's president, Seridan [sic] Garrison, concerning the problems at the Paris Terminal.

[8]Mrs. Prunty challenges this finding as clearly erroneous. However, this Court's disposition of the other issues in this case relieves us of the necessity of reviewing that factual finding.

5

such damages could not be recovered under those provisions.

Mrs. Prunty appeals, challenging the district court's legal conclusions that Title VII and article 5221k disallow the recovery of compensatory and punitive damages. She also challenges the district court's holding that AFI could be liable for Baugh's actions only if Baugh acted within the course and scope of his employment.

## II. Discussion

### A. Title VII and Article 5221k Damages

Mrs. Prunty sought damages for the differences in wages and benefits between her job at AFI and her position with the Postal Service. She also sought damages for the travel expenses she incurs in driving to and from Dallas each day. The district court, however, determined that Mrs. Prunty presented no evidence of wage or benefit differentials.[9] The court further decided that Title VII and article 5221k do not authorize the grant of compensatory and punitive damages under their provisions. The district court's interpretation of those statutes was a legal conclusion which this Court would usually review *de novo*. *Palmco Corp. v. American Airlines, Inc.*, 983 F.2d 681, 684 (5th Cir.1993). However, we need not address the propriety of the district judge's conclusions, for our review of the record reveals that Mrs. Prunty did not present any evidence of damages whatsoever.

It is truistic, indeed elementary, that one who seeks compensatory damages must present evidence of those damages. DAN

---

[9]Mrs. Prunty has not questioned this finding.

B. DOBBS, REMEDIES § 3.2, at 140 (1973). Hence, when one of the *prima facie* elements of a claim is damages and the claimant fails to introduce evidence of those damages, he or she commits a fatal error. In such cases, the district court has no choice but to deny the monetary relief requested. Thus, in this case, Mrs. Prunty's failure to prove damages precluded her recovery of those damages, regardless of whether Title VII and/or article 5221k authorized the type of damages she requested.[10] We therefore affirm the district court's denial of the requested relief under Title VII and article 5221k, albeit for reasons other than those given by the district court.

B. Ratification

The district court concluded that an employer can be held liable for the intentional torts of its employee only when the employee acts within the course and scope of his employment and when the act furthers the object for which the employee was hired. This legal conclusion is subject to *de novo* review. *Palmco Corp.*, 983 F.2d at 684.

A review of Texas law reveals quite readily that the district court erred in its legal conclusion. The law has been well-settled in Texas for well over a century that if an employer or a manager

---

[10]At oral argument before this Court, counsel for Mrs. Prunty asserted that she had introduced evidence that Mrs. Prunty's post office job required her to drive to and from Dallas daily. However, proving that damages *exist* is only one component of proving damages. Claimants must also prove the *amount* of those damages. This, Mrs. Prunty failed to do.

for an employer ratifies[11] or approves the intentional, malicious, or grossly negligent acts of an agent, the employer may be liable, not only for compensatory damages, but also for exemplary damages.[12]

---

[11]The ratification question is properly before this Court. Indeed, counsel for AFI acknowledged during his oral argument before this panel that Prunty had proffered the ratification issue before the district court during the trial. Prunty likewise properly raised the ratification issue before this Court: During oral arguments she averred that AFI had ratified Chuck Baugh's actions. More importantly, under the section of her brief entitled "Arkansas Freightways is liable for the actions of Chuck Baugh for the intentional infliction of emotional distress upon Mildred Prunty," she explained that Rippy knew of the sexual harassment but did nothing to stop it. Such a failure to repudiate the egregious acts of Baugh is, by definition, ratification. Hence, the ratification ball has never been hidden from any participant in this litigation—not the parties, not the district court, nor the members of this Court.

[12]If the employer's liability is based upon *respondeat superior* grounds, *then* the employee must have acted within the scope of his employment. *Country Roads, Inc. v. Witt,* 737 S.W.2d 362, 364 (Tex.App.—Houston [14th Dist.] 1987). However, the Texas Supreme Court made clear in *Ft. Worth Elevators Co. v. Russell* that ratification is not based upon *respondeat superior* principles. Ratification is based upon the wrongdoing of the employer—the employer's ratification of the intentional or grossly negligent acts of its agents. 123 Tex. 128, 70 S.W.2d 397, 402-03, 406 (1934).

Outside the *respondeat superior* realm, the scope of employment requirement arises only in one context. An employer may be held liable for *exemplary* damages for the malicious or grossly negligent acts of its manager only if that manager acted within the scope of his or her employment. No scope of employment requirement exists in other non-*respondeat superior* situations. Hence, Texas courts have repeatedly and consistently held that an employer is liable for exemplary damages because of the willful acts of its agents if, but only if:

(a) the principal authorized the doing and the manner of the act, or

(b) the agent was unfit and the principal was reckless in employing him, or

(c) the agent was employed in a managerial capacity *and*

8

*Purvis,* 595 S.W.2d at 104; *King,* 234 S.W.2d at 404; *Ft. Worth Elevators Co.,* 70 S.W.2d at 404-06; *Gulf, Colorado and Santa Fe Ry. Co. v. Reed,* 80 Tex. 362, 15 S.W. 1105, 1107 (1891); *Hays v. Houston and Great Northern R.R. Co.,* 46 Tex. 272 (1876); *Shearson Lehman Hutton, Inc. v. Tucker,* 806 S.W.2d 914, 925 (Tex.App.—Corpus Christi 1991, writ dism'd w.o.j.); *Al Parker Buick Co. v. Touchy,* 788 S.W.2d 129, 130 (Tex.App.—Houston [1st Dist.] 1990); *Group Hospital Services, Inc. v. Daniel,* 704 S.W.2d 870, 877 (Tex.App.—Corpus Christi 1985); *see also Hitt v. East Texas Theatres, Inc.,* 203 S.W.2d 963, 969 (Tex.Civ.App.—Texarkana 1947) (Finding that the employee had not acted within the scope of his employment, the court then turned to the question of whether the employer had ratified the employee's acts).

Very few Texas appellate courts have discussed ratification in tort cases. However, the few courts which have faced that question have decided that ratification may occur when the employer or its vice-principal confirms, adopts, or fails to repudiate the acts of its employee. *Hinote v. Oil, Chemical and Atomic Workers International Union, AFL-CIO, Local 4-23,* 777 S.W.2d 134, 141 (Tex.App.—San Antonio 1989, writ denied); *K-Mart No. 4195 v. Judge,* 515 S.W.2d 148, 153, 154 (Tex.Civ.App.—Beaumont 1974, writ

---

> *was acting in the scope of employment,* or
>
> (d) *the employer or a manager of the employer ratified or approved of the act.*
>
> *Purvis v. Prattco, Inc.,* 595 S.W.2d 103, 104 (Tex.1980) (quoting *King v. McGuff,* 143 Tex. 432, 234 S.W.2d 403, 404 (1950) (emphasis added)); *see also Ft. Worth Elevators Co. v. Russell,* 123 Tex. 128, 70 S.W.2d 397, 404-06 (1934).

9

dism'd w.o.j.). The San Antonio Court of Appeals accepted a trial court's definition of ratification in *Hinote:*

> "RATIFICATION" means the adoption, confirmation or failure to repudiate prior unlawful acts which were not legally binding at a time when the [defendant] had the right and knowledge of facts necessary to repudiate such conduct; but which, by ratification or by the failure to repudiate, become the acts of the defendant.

777 S.W.2d 134, 141. The Beaumont Court of Civil Appeals held in *Judge* that since the defendant company's manager had not repudiated the intentional, tortious acts his employees, the defendant company, *as a matter of law,* had ratified the acts. *Judge,* 515 S.W.2d at 153, 154.

Additionally, the Texas Supreme Court has determined that in some cases, an employer's retention of an employee who has committed a tort may constitute ratification. *See Reed,* 15 S.W. at 1107; *International and Great Northern R.R. Co. v. McDonald,* 75 Tex. 41, 12 S.W. 860, 862 (1889). When the company 1) knows about the employee's acts, 2) recognizes that the employee's acts will continue if he is retained, 3) does nothing to prevent the ongoing tortious acts, and 4) chooses to retain the employee, the company ratifies the tortious acts and may be held liable for exemplary damages. *See Reed,* 15 S.W. at 1107; *McDonald,* 12 S.W. at 862.

In this case, the district court found that Mr. Rippy, the vice president of AFI's southwestern region—a vice principal of the corporation[13]—knew about Baugh's harassment of Prunty and took no

---

[13]Because Mr. Rippy is a corporate officer and because he has the authority to direct, supervise, hire, and discharge subordinates, he is a vice principal whose acts may subject AFI to liability for exemplary damages. *Ft. Worth Elevators Co.,* 70

action to end the harassment. Until Mrs. Prunty contacted AFI's president, Mr. Garrison, Rippy did absolutely nothing about the sexual harassment. Indeed, Mr. Rippy only investigated Prunty's allegations *after* he was ordered to do so by a superior officer.

In regard to ratification, of course, it is evident that before one can ratify an act so that it becomes his own, he must know of the act with which he is charged. In *Wilson v. Monarch Paper Co.,* we observed that "although [the employer's] conduct often rises to the level of illegality, except in the *most* unusual cases it is not the sort of conduct, as deplorable as it may sometimes be, that constitutes "extreme and outrageous' conduct." 939 F.2d 1138, 1143 (5th Cir.1991). In other words, even though conduct may violate Title VII as sexual harassment, it does not necessarily become intentional infliction of emotional distress under Texas law. Only in the most unusual cases does the conduct move out of the "realm of an ordinary employment dispute," *Dean v. Ford Motor Credit Co.,* 885 F.2d 300, 307 (5th Cir.1989), into the classification of "extreme and outrageous," as required for the tort of intentional infliction of emotional distress. *See Wilson,* 939 F.2d at 1145.

No one can seriously doubt—and the district court specifically found—that "Mr. Baugh's *sexual harassment* of [Mrs.

_____

S.W.2d at 406; *Southwestern Bell Telephone Co. v. Reeves,* 578 S.W.2d 795, 800 (Tex.Civ.App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.).

11

Prunty] was extreme and outrageous."[14] (Emphasis added.) However, if Mr. Rippy were made aware *only* of "an ordinary employment dispute," he plainly, under the authority of this Court's precedent, did not have sufficient knowledge to ratify Mr. Baugh's "extreme and outrageous" tortious conduct so as to expose AFI to liability for the tort of intentional infliction of emotional distress.

This Court must look, then, to the district court's findings

[14]The district court found, and AFI concedes, that Baugh's conduct and statements were extreme and outrageous. Mrs. Prunty and other workers testified about some of the things which Mr. Baugh did: Among other things, he often told Mrs. Prunty and the other workers about sexually explicit dreams he had of Mrs. Prunty. On at least one occasion, Baugh told Prunty that he had seen a nude picture of her in a magazine. He claimed that the woman in the picture was hanging from a tree with her legs over the tree limb so as to expose and display her pudendum.

Baugh also described how he thought Mrs. Prunty's sexual organs looked in extremely graphic and vulgar ways. He told the truck drivers and dock workers that "[Prunty's] pussy probably looks like she was hit between the legs with a double axe" and that "she would have to have a two-by-four to keep herself from falling in." Additionally, he constantly accused Mrs. Prunty of engaging in sexual acts with another worker. One witness testified that Baugh was "always" saying that "Jerry is fucking [Prunty] up here while we're gone [from the office]." Further, Chuck Baugh brought obscene items, including a crocheted replication of a man's genitalia, to work to show them to Mrs. Prunty and to the other workers. He also talked to Prunty, over her protestations, about the sexual acts of animals. Once, he even touched Mrs. Prunty's breast.

All of the witnesses who had worked in the Paris terminal acknowledged that these types of comments and activities occurred on a *day-to-day basis.* Although the other employees were all men, they testified that they were offended by Baugh's conduct. Further, each felt that the comments were extremely degrading to Mrs. Prunty. In fact, one of AFI's employees testified that he believed that Mr. Baugh's conduct had placed Mrs. Prunty on the brink of a nervous breakdown.

12

of fact and conclusions of law to determine whether Mr. Rippy's knowledge reached the level required for ratification. The district court found, *inter alia,* the following:

> ... Mr. Baugh subjected plaintiff directly and indirectly to sexual comments and innuendo. This conduct continued during the entire time Mr. Baugh was terminal manager. Plaintiff complained to Mr. Baugh's supervisor, O.D. Rippy, about the working conditions ... on several occasions.... [T]he Court finds that Mr. Rippy was aware of the sexual harassment of plaintiff by Mr. Baugh.... Mr. Rippy took no action to remedy the situation.... [P]laintiff contacted defendant's president ... concerning the problems at the Paris Terminal. Mr. Baugh's actions toward plaintiff were offensive, unwelcome, and constituted sexual harassment. This harassment altered the conditions of plaintiff's employment with defendant and created an abusive, hostile, and offensive working environment.... Mr. Baugh's harassment was so pervasive that defendant is charged with constructive knowledge of such harassment.... Mr. Baugh's sexual harassment of plaintiff was intentional and reckless, was extreme and outrageous [and] caused plaintiff severe emotional distress....
>
> ....
>
> In order to establish a claim for intentional infliction of emotional distress, the plaintiff must prove: ... (2) that the conduct was extreme and outrageous; ... and (4) the emotional distress suffered by the plaintiff was severe. *Dean v. Ford Motor Credit Co.*.... Mr. Baugh's actions amounted to an intentional infliction of emotional distress upon plaintiff.

Although the district court's findings could have been more specific, this Court reads that court's findings as a determination that Mr. Rippy not only knew of the sexual harassment, but also knew enough about the harassment to realize that Chuck Baugh's conduct was extreme and outrageous.[15] Although there is some

---

[15]The district court's listing of the factors from *Dean* evinces its awareness that the additional findings—beyond those necessary for a Title VII claim—were required to establish the tort. It is undoubtedly for this reason that the court specifically found not only that Mr. Rippy was aware of the

dispute as to precisely what details were communicated to Mr. Rippy, it was not clearly erroneous for the district court to so find, particularly in view of the pervasive and day-to-day recurrence of Mr. Baugh's statements and actions.

Applying these facts to Texas' definition of ratification reveals that Mr. Rippy ratified Mr. Baugh's infliction of emotional distress upon Mrs. Prunty. We therefore hold that the district court, while not clearly erring in its findings of fact, erred in its conclusion of law by denying Mrs. Prunty damages based upon her claim of intentional infliction of emotional distress.

### III. Conclusion

Because Mrs. Prunty failed to introduce evidence of her general and special damages, the Court need not reach the Title VII and article 5221k issues. Clearly without such evidence of damages, Mrs. Prunty is not entitled to the relief she requested. We therefore AFFIRM the district court's denial of that relief.

As to the intentional infliction of emotional distress claim, however, the district court failed to apply the facts which he found—Rippy knew of the sexual harassment but failed to remedy the situation—to applicable Texas law. Such was error. Applying those facts to Texas law compels the conclusion that Mr. Rippy ratified Baugh's actions, thereby subjecting AFI to liability for actual and exemplary damages. This Court must therefore REVERSE and REMAND the intentional infliction of emotional distress claim to the

---

sexual harassment, but also that the sexual harassment was "extreme and outrageous [and] caused plaintiff severe emotional distress."

14

district court for the assessment of damages.

EMILIO M. GARZA, Circuit Judge, concurring in part and dissenting in part:

The majority imposes liability based on its holding that "applying [the] facts to Texas' definition of ratification clearly reveals that Mr. Rippy ratified Mr. Baugh's infliction of emotional distress upon Mrs. Prunty."[1] However, Mrs. Prunty did not plead ratification.[2] Because her pleadings did not encompass

---

[1] I join the majority in their revulsion of Chuck Baugh's conduct, which was more than adequately proven below. My disagreement with the majority opinion lies in the method by which it imposes liability; that is, by changing Mrs. Prunty's only viable appellate argument—course and scope of employment—to an appellate point that she did not contend—ratification. *See* maj. op. slip opinion at 3169 n. 8 (acknowledging that Mrs. Prunty challenges the district court's finding that Mr. Baugh had not acted within the course and scope of employment, but disposing of the case on other issues).

[2] Mrs. Prunty's claim that Arkansas should have investigated and determined the cause of the problems between her and Mr. Baugh is the closest that Prunty comes to making a ratification argument. *See* Record on Appeal, vol. 1, at 5 (Plaintiff's Original Petition) ("Arkansas Freight Way failed to take any corrective action after they were notified of the Plaintiff's complaint."); Brief for Prunty at 19 (Prunty "made repeated complaints as to Chuck Baugh's [conduct] but Arkansas turned a deaf ear.... [A]ny reasonable employer would investigate to determine what is the cause of the problems."). Prunty's contention that Arkansas breached its duty to investigate her complaints is better characterized as a claim of negligence, rather than ratification. "Ratification" is

> the adoption, confirmation or failure to repudiate prior unlawful acts which were not legally binding at a time when the [defendant] had the right and knowledge of facts necessary to repudiate such conduct; but which, by ratification or by the failure to repudiate, become the acts of the defendant.

Maj. op. slip opinion at 3171. "Actionable Negligence" is defined as "[t]he breach or nonperformance of a legal duty, through neglect or carelessness, resulting in damage or injury to another. It is failure of duty, omission of

15

ratification, Mrs. Prunty did not intend to, nor did she, prove ratification.[3]  She did not argue ratification to the district

something which ought to have been done, or which reasonable man, guided by considerations which ordinarily regulate conduct of human affairs, would or would not do."  Black's Law Dictionary 29 (6th ed. 1990).  By requiring knowledge of facts necessary to repudiate unlawful conduct, ratification requires a higher standard of proof than actionable negligence.  The record clearly demonstrates that Mrs. Prunty never argued that Mr. Rippy knew of facts about Mr. Baugh's unlawful conduct necessary to repudiate such conduct, but only that Mr. Rippy had enough information to conduct an investigation.  *See infra* notes 3 & 4.

[3]The record clearly shows that Mr. Rippy did not know about the extreme and outrageous nature of Mr. Baugh's conduct.  For example, compare the generalities contained in Mrs. Prunty's letter to Mr. Rippy (Oct. 21, 1988) with the specifics in her letter to Sheridan Garrison (Apr. 25, 1989).  In her October 21 letter, Mrs. Prunty stated:

> I know you are a busy man and the problems you face each day are tremendous but the situation here at Paris has come to be a real problem.  As you know in the past we have had a few problems but we were able to pull together and work things out.  I was all excited about the growth and expansion at our terminal and welcomed Chuck Baugh aboard as Terminal Manager with great expectations.  Chuck came across to us all as a leader and with all the experience and abilities it takes to be one.
>
> It wasn't 48 hours later and we had a problem and it's become a bigger one every [sic] since.  I have been trying to work with Chuck on many things and I want to work with Chuck but I want him to have as much respect for me as I have shown for him.
>
> He has made sarcastic remarks as to why he was hired as Terminal Manager saying "If you had been doing your job they wouldn't have had to hire me."  He also has said "As a "woman' I would like to see you make it in this business as a [sic] Operations Supervisor."  I use [sic] to feel secure in my job with Arkansas Freightways but Chuck has threatened my job on several occasions in the last five weeks.
>
> Our relationship has deteriated [sic] to the point where we are unable to peacefully discuss matters.  He

16

has an abusive language (not cursing) it is the tone of voice he uses. I have been trying to do as you ask me to and do what ever he asks me to do but things are not working out as well as expected.

His attitude toward his job is effecting [sic] each and everyone of us negatively at Paris.

Please help!

Plaintiff's Exhibit 2. In her April 25 letter, Prunty wrote:

I am reluctant to write you concerning the problems I am having with the local Terminal Manager, Chuck Baugh. I sent a letter to Mr. Rippy concerning this some months back. I had no reply to this letter (copy attached). If something had been said then maybe things would not have progressed as they have. Chuck has went [sic] beyond the limits of professionalism by making rude and obscene comments about me personally and about me and some of the other people that work at the local terminal. I have witnesses to this effect. He has also told these obscene things about me to another member of management at a terminal in our area.

He is continually putting me down as a woman in this profession. I would appreciate your help in correcting this situation fore [sic] it has gotten totally out of control.

Customers in the area are also aware of the problem we are having and have brought this matter to Chucks' [sic] attention on two separate accosions [sic] (Hon Furn. and Texas Tag). This problem is spreading beyond the confines of this office and I am not interested in seeing Arkansas Freightways new reputaion [sic] in Texas being destroyed by one persons [sic] obviously disturbed actions.

Plaintiff's Exhibit 3.

Furthermore, and perhaps more importantly, compare the graphic descriptions of Baugh's conduct, maj. op. slip opinion at 3172 n. 14, with Mrs. and Mr. Prunty's testimonies at trial which indicate that Mr. Rippy was never informed of Mr. Baugh's specific acts.

Mrs. Prunty testified:

17

Questions by Ms. Colson:

Q After he was hired, did you have a discussion with Mr. Rippy about Mr. Baugh?

A Yes, ma'am. I had one discussion with him that first week.

Record on Appeal, vol. 2, at 24.

Q Within the first week, what sort of discussion did you have with Mr. Rippy?

A Well, I told him that this—you know, that we weren't getting along well and that the way he was, you know, trying—I believe I told him exactly what he said, that, you know, he would like to see me make it as a woman in operations supervisor and that we weren't—you know, we just weren't clicking together. We couldn't get along. Everything was just like, whatever I did, it was wrong. He told me we would just have to work our problems out between us.

Q The remarks that you [sic] were making at this time, was it out of your job performance or were they more of a personal nature?

A Just seemed like it was just personal to me, because I was doing exactly what I had been doing before. I could realize that some things, you know, probably need to be changed, you know, to improve it a little bit, but, you know, no matter how I did it, if I done it the way he wanted, that wasn't the way it was supposed to have been done.

*Id.* at 25-26.

Q Did you ever—after your conversation with Mr. Rippy, did you ever contact—first conversation, did you ever contact him again?

A Yes, ma'am. I called Mr. Rippy at home. Me and the other drivers got together and we decided if we called him and all of us called him that he would do something. So after we all got through working that night we decided we would call him. We called him from work and all of us were there, me and Jerry and Robert and Tim, and we decided we would call him at home, because that's how important it was.

18

So we called him at home and I told him, you know, that we were having problems and we couldn't get things worked out and that he was acting in an unprofessional manner. And he just told us, you know, that we would have to just, you know, work with it, what we—to work things out. And I told him, I said: Well, we're all—you know, we don't want to quit, you know, meaning all of us. And he said: Well, if y'all want to find another job, it would be fine with him.

Q As I understand it, you told him that Mr. Baugh was acting unprofessional?

A Yes, ma'am.

Q What else did you tell him about his behavior?

A I just, you know, told him that we—the way he would, you know, do things, it was just—I didn't see it was a correct way to do. It was just—lack of words to put it how he was acting.

*Id.* at 37–38.

Q Then you sent him a letter and then y'all called him all one evening?

A Yes, ma'am.

Q Did anyone else that you know of contact Mr. Rippy about the problems?

A Not that I'm aware of.

*Id.* at 41.

Q Did your husband ever contact Mr. Rippy?

A Yes, Ma'am. He called him at home. When he was in California he had called me at work and I was upset, and somehow or another he got Mr. Rippy's home phone number and he called Mr. Rippy at home. I asked him not to, but he did.

*Id.* at 41.

Questions by Mr. Gilker:

Q When he came and interviewed you, did you ever tell Mr. Rippy about that as part of the problems you had

19

with Arkansas Freightways?

A No, sir.  I don't believe Mr. Rippy was aware of that photograph.

Q When you spoke to Mr. Rippy and he interviewed you on 4/28/89, did you tell him about this dream incident that Mr. Baugh allegedly made?

A That what?

Q The dream statement that Mr. Baugh allegedly stated.

A When Mr. Rippy came down in April '89?

Q The day he came up and investigated the problems.

A I don't recall what was said to Mr. Rippy that day. I told him some of the things that day what was said, yes.  I couldn't say it to him.  I believe I wrote it down, because I couldn't say it to him.

Q Had you ever told Mr. Rippy before that day about any of these problems that you have testified a minute ago?

A Not in graphic detail I did not.  I just told him that he was acting in an unprofessional manner, and that's what I said to Mr. Rippy.

Q Did you ever say, "He's wearing a tie with a naked woman on it"?

A No, sir.

Q Or did you ever say, "He's wearing a belt buckle that I consider offensive" to Mr. Rippy?

A No, sir.

Q Did you ever tell him—you said he was acting unprofessional.  What context did that statement come up?  Was that the telephone call with you and the other three employees were on?

A I believe so.  I called him at home and we was trying to make him aware that we were having problems there, and he just—if he had just came and talked to us that day.

*Id.* at 61-62.

Q And in this phone call, you didn't tell him that—you did not tell him about the tie incident or any of the inappropriate remarks that he was making to any of the employees?

A No, sir.

Q The most you said is, what, he is acting unprofessional and you complained about how the terminal is being run?

A Yes, sir.

*Id.* at 63.

Questions by the Court:

Q You say that you told Mr. Rippy when you first talked to him about a problem in the office that he was acting in an unprofessional manner.

A Yes, sir.

Q Is that your testimony?

A Yes, sir.

Q Did you say anything further as to how he was acting in an unprofessional manner?

A No, sir, and Mr. Rippy did not ask.

Q He didn't ask what you meant by that?

A No, sir.

Q He just said you all needed to get along?

A Yes, sir.

Q How many times did you advise Mr. Rippy that he was acting in an—I talking about Mr. Baugh—was acting in an unprofessional manner, either in writing or orally?

A I can recall at least three phone calls that I called him, two to Dallas and one to his home. And then I wrote him the letter and sent it to the Dallas terminal.

Q Were all of those conversations the same with regard

21

to whether or not you discussed how he was acting in an unprofessional manner?

A Yes, sir.  I would just say, you know, that things weren't working out or, you know, that he's, you know, not acting responsibly or unprofessional, and he would say the same thing, you know, we just have to work it out, you know.  That was between me and him and he wanted us to get along and for the Paris terminal to run, you know, smooth and everything.

Q He never inquired—

A No, sir.

Q —as to what the problem was?

A No, sir.

*Q On the other hand, you never specifically referred to any offensive remarks that may have been made of a sexual nature?*

*A No, sir.*

*Id.* at 73-75 (emphasis added).  Mr. Jerry Prunty testified:

Questions by Ms. Colson:

A Yes.  I called Mr. Rippy one night and talked to him.

Q When was this?

A I don't know when the date.  I was in California when I called him.

*Id.* at 86.

Q And I believe you said you were in California?

A Uh-huh.

Q And who did you call?

A Mr. O.D. Rippy.

Q And what was the nature of your—did you get to talk to Mr. Rippy?

A Yes, I did.

22

Q And did he know who you were?

A Uh-huh.

Q And what was the nature of your discussion?

A Well, I just asked him about Chuck and the stuff that they had done, you know, what he had done, the talk and all the—

*Q Did you give specific details?*

*A No, I didn't go into that.*

*Q What did you tell him?  Did you talk to him about remarks that were being made?*

*A Uh-huh, about the remarks and stuff he had made and the gestures he had made.*

Q And when you talked about those, what did you tell him specifically?

A That—just that's all I asked him, could he—could he see about doing something about it.

Q And you did mention about gestures and remarks that were being made?

A Yes, I did.

Q What was Mr. Rippy's reaction?

A He told me they would have to work that out, that her and Mr. Baugh would have to work that out.

*Id.* at 87-88 (emphasis added).

Questions by Mr. Gilker:

Q When you called Mr. Rippy from California, do you remember the date?

A No, I can't.

Q Was it before Christmas or after Christmas?

A I don't remember.

Q What specifics did you tell Mr. Rippy in this

23

telephone conversation?

A Well, I just told him Mildred was under a lot of stress and that she hadn't been, you know, since Mr. Baugh had come. They just weren't getting along and all the remarks and stuff.

Q *Now, what remarks did you tell Mr. Rippy about?*

A *I didn't tell—I didn't go into it. I just said remarks and the gestures.*

Q There was a lot of stress since Mr. Baugh had taken over?

A I just said the things he was saying about her that those drivers had told me and that she had told me.

Q *What things did you tell Mr.—I guess—*

A *That's all I told him, just the remarks. I said something about the remarks.*

Q I'm not clear. What remarks did you tell him, or you just said the word "remarks'?

A Uh-huh. I said they was having problems.

Q *You didn't tell him any—you didn't tell him what—*

A *No, I didn't go into—I didn't go into detail.*

Q You didn't say, "He's saying gross things about my wife,' or anything like that?

A I just said the things that he was saying. You know, I didn't say bad things or whatever.

Q Just that they're having problems and she's under a lot of stress?

A Yeah.

Id. at 91-93 (emphasis added).

Questions by the Court:

Q You say you called Mr. Rippy and said your wife was under a lot of stress?

24

A Yes, sir.

Q That she had problems with Mr. Baugh?

A Uh-huh.

Q What else did you say to him, if you can remember?

A I just asked—what I asked him—that's all I said about the problems.  I just asked him could he see about it, and he told me that was—they would have to work that out.

*Q Well, you testified earlier you said something about remarks.  Did you say anything to him about remarks or not?*

*A I didn't go into any detail, just about what he had been saying about her is what I was saying.*

*Q Well, what did you tell Mr. Rippy about that, if anything?*

*A I didn't go into any detail about the remarks, about what he said.  I just said that what he had been saying.  I just said they had problems.*

*Q Can you tell me exactly what you said to him?*

*A Not exactly.*

*Q Well, can you tell me what—is all you said is that they were having problems?*

*A Problems about what he had been saying to the dock hands about Mildred.*

Q That's what you told him?

A Yes, sir.

*Id.* at 93-94 (emphasis added).

Mr. Rippy was never told about Mr. Baugh's dream, picture, tie, belt buckle, and specific remarks, nor was he told about the incident when Mr. Baugh unzipped his trousers to adjust his shirt.  *See* Record on Appeal, vol. 2, at 73-75 (Mrs. Prunty's testimony), 93-94 (Mr. Prunty's testimony). Moreover, the cases cited by the majority opinion—*Judge, Reed,* and *McDonald*—are distinguishable because all three

25

court.[4] *See United States v. Garcia-Pillado,* 898 F.2d 36, 39 (5th Cir.1990) ("We have stated that issues raised for the first time on appeal "are not reviewable by this court unless they involve purely legal questions and failure to consider them would result in

> involved situations where the employer knew about the specific unlawful conduct.

[4]Prunty only argued that Freightways had a duty to investigate her complaints that she and Baugh were having problems, and does not contend that Arkansas *knew facts* necessary for it to repudiate Mr. Baugh's unlawful acts. Ms. Colson stated in final argument:

> I think in this case the testimony has shown that she notified them, she put them on notice that she was having problems. These weren't just adjustment problems. She wrote him a letter, she called him, her husband called him. She finally wrote a letter to the president of the company.
>
> Ms. Prunty is a person who was reluctant to go into graphic details, and probably most women would be—or persons would be reluctant to go into graphic detail. I think they had enough information and they were put on enough notice to be aware of what was going on, and they should have investigated it. And they did not investigate it and did not believe her complaint. They refused to go and do that, and I think they were under a duty to do that and they should have done so, but they did not do so.

*Id.* at 193; *see also* Record on Appeal, vol. 1, at 52 (Plaintiff's Brief as to Damages Pursuant to State Cause of Action) (arguing that Arkansas should be held liable for damages for intentional infliction of emotional distress because Mr. Baugh was employed in a managerial capacity and was acting within the course and scope of employment, and because the act furthered the object for which Mr. Baugh was hired); *Id.* at 66-69, 71-72 (Plaintiff's Post Trial Brief) (same).

Furthermore, there is no indication in the record that Mrs. Prunty simply mislabeled her theory of recovery. Most telling is the fact that none of the cases cited by or the arguments set forth by the majority in Part II.B. are contained in any briefs filed by the parties on appeal or contained in the record or referred to in the trial below.

26

manifest injustice.' " (citations omitted)). The district court

did not find ratification.[5] Nor did she preserve this issue on

---

[5]The majority's logic in "finding" ratification is curious indeed. The majority initially states the issue before this Court as follows: "The district court concluded that any employer can be held liable for the intentional torts of its employee *only* when the employee acts within the course and scope of his employment and when the act furthers the object for which the employee was hired." Maj. op. slip opinion at 3170 (emphasis added). However, the record reflects that the district court did not find "that any employer can be held liable for the intentional torts of its employee *only* when the employee acts within the course and scope of his employment and when the act furthers the object for which the employee was hired." *See* Record on Appeal, vol. 1, at 83 (Conclusions of Law, 17-20). Furthermore, Mrs. Prunty does not, as the majority states, "challenge[ ] ... that AFI could be liable for Baugh's actions *only if* Baugh acted within the course and scope of employment." Maj. op. slip opinion at 3169 (emphasis added). From this "straw" issue the majority can then "readily" conclude "that the district court erred in its legal conclusion," finding that ratification, an issue not before the district court, is also a basis for liability. Maj. op. slip opinion at 3173-74.

Second, in holding that Arkansas ratified Mr. Baugh's conduct, the majority bases its conclusion on the district court's finding that "Mr. Rippy ... knew about Mr. Baugh's harassment of Prunty and took no action to end the harassment." Maj. op. at 3172. However, as the majority correctly points out: "[E]ven though conduct may violate Title VII as sexual harassment, it does not necessarily become intentional infliction of emotional distress under Texas law. Only in the most unusual cases does the conduct move out of the "realm of an ordinary employment dispute,' [and] into the classification of "extreme and outrageous,' as required for the tort of intentional infliction of emotional distress." Maj. op. slip opinion at 3172 (citation omitted). The district court did *not* find either "that Mr. Rippy ... knew ... that Chuck Baugh's conduct was extreme and outrageous," or "that Mr. Rippy ... knew enough about the harassment to realize that Chuck Baugh's conduct was extreme and outrageous." Maj. op. slip opinion at 3173; *see* Record on Appeal, vol. 1, at 83 (Conclusions of Law, 17-20). The district court did find, however: "17. Mr. Baugh's actions amounted to an intentional infliction of emotional distress upon the plaintiff. 18. An employer is liable for the actions of any employee when the act is within the employee's general authority and when the act furthers the object for which the employee was hired. 19.

27

appeal.[6]  *See Weaver v. Puckett,* 896 F.2d 126, 128 (5th Cir.1990)

---

Mr. Baugh's actions against plaintiff were not in furtherance of any object of defendant; therefore, plaintiff cannot recover from defendant for emotional distress. 20. All costs are to be paid by defendant." *Id.* (citation omitted). The district court made the necessary findings on the only vicarious liability issue presented to the Court by Mrs. Prunty for determination: "course and scope of employment." Inversely, the district court made *no* finding on any other liability issue sounding in tort, including ratification.

Third, since the district court did not find ratification, the majority must supply this missing link in the manner it "*reads* [the] court's findings." Maj. op. slip opinion at 3173. The majority, not the district court, finds (reads) that "Mr. Rippy ... *knew enough* about the harassment *to realize* that Chuck Baugh's conduct was extreme and outrageous." Maj. op. slip opinion at 3173. For the panel majority, therefore, "constructive knowledge" is sufficient, contrary to its own statement of Texas law, to establish ratification as a matter of law. *See* maj. op. at 3172 ("In regard to ratification, of course, it is evident that before one can ratify an act so that it becomes his own, he must know of the act with which he is charged.").

[6]*See* Brief for Prunty at 11 (In her statement of issues presented on appeal, Mrs. Prunty stated: "Arkansas Freightways is also liable for Chuck Baugh's actions in his intentional infliction of emotional distress of Mildred Prunty in that his actions were in furtherance of his employer's business for which he was hired and that was the supervision of employees in the Paris terminal."), 18-19. The majority indicates that "the ratification question is properly before this Court" because (1) AFI acknowledged that Prunty had proffered the issue before the district court; (2) Prunty raised the issue during oral arguments; and (3) Prunty explained in her brief that Rippy knew of the sexual harassment but did nothing to stop it. *See* maj. op. slip opinion at 3170 n. 11. None of these reasons forms a basis for appellate review. First, this Court brought up the issue of ratification—not Mrs. Prunty. Second, although counsel for AFI stated during oral argument that Mrs. Prunty raised the issue of ratification before the district court, he also stated during oral argument that "[t]hat issue [—ratification—] was never raised by [Mrs. Prunty] in her pleadings." Third, the record clearly indicates that ratification was not an issue before the district court. *See supra* nn. 2-5. Fourth, an isolated statement in Mrs. Prunty's brief stating that Rippy knew of the sexual harassment is insufficient to preserve this point on appeal. *See* Fed.R.App.P. 28(a).

(Stating that appellant abandoned issue on appeal, because "Fed.R.App.Proc. 28(a)[ (5) ] requires that the appellant's [brief] contain the reasons he deserves the requested relief "with citations to the authorities, statutes and parts of the record relied on.' "), *cert. denied,* 498 U.S. 966, 111 S.Ct. 427, 112 L.Ed.2d 411 (1990). Nonetheless, the majority reverses on the basis of ratification.

Accordingly, I respectfully dissent from Part II.B. of the majority opinion.