Captain Sheriff SAUDI, Plaintiff,

v.

ACOMARIT MARITIMES SERVICES, S.A., Defendant.

CIVIL ACTION NO. 01–4301.

United States District Court, E.D. Pennsylvania.

Jan. 31, 2003.

See also: 159 F.Supp.2d 469.

Sheriff Saudi, Captain, Bellaire, TX, Pro Se.

Carl D. Buchholz, III, Rawle & Henderson, Philadelphia, PA, Thomas R. Nork, Keith B. Letourneau, Bell Ryniker Letourneau, Houston, TX, for Defendant.

### MEMORANDUM

BAYLSON, District Judge.

In Wagner's opera, *The Flying Dutchman,* the hero, a ship captain, is consigned by fate to sail the seas in virtual perpetuity and may land only once every seven years. Wagner's opera sets to music an ancient legend; its modern incarnation are the ocean-going supertankers, which are so large, they cannot dock in any port. For good business reasons, they are usually owned by foreign corporations and avoid transactions in the United States, which may subject them to the jurisdiction of U.S. courts. The cargo on these huge vessels must be unloaded many miles offshore. If a person is injured during offshore loading, where may suit be filed? Thus, the legal issue presented by this case—are the owners/operators of these ships subject to jurisdiction in the United States for tort claims when the ships never enter the territorial waters of the United States?

Thus, the Dutchman's fate of continual years at sea has become a benefit for the modern supertanker. As the opera ends, the Dutchman's yearning for dry land has brought him romance and redemption, but he then drowns in the arms of his beloved. However, the modern, perpetually ocean-roaming supertanker has neither the physical ability, nor the legal desire, to touch

land. If the limits of the jurisdiction of U.S. courts do not allow the owner or operator of these ships to be subject to process in the United States, then the only recourse for someone who was injured by the operation of this ship is to seek redress in and under the laws of the country in which the ship's owners or managers are based.

For the reasons which follow in this Memorandum, the Court concludes that although the Plaintiff, Captain Sheriff Saudi, a resident of Texas, alleges a significant personal injury while working in the Gulf of Mexico, fifty miles offshore, to help unload the Marine Atlantic, a supertanker managed by the Defendant, Acomarit Maritimes Services, S.A., (now known as V. Ships Switzerland, S.A.) ("Acomarit"), a foreign corporation with its principal place of business in Switzerland, Plaintiff has not met his burden of showing that Acomarit is subject to jurisdiction in this district, and thus Acomarit's Motion to Dismiss for lack of personal jurisdiction will be granted.

## I. *Background*

### A. *Factual Background*

The following facts are construed in the light most favorable to Plaintiff.

Plaintiff was employed as a "mooring master" by American Eagle Tankers, a company providing maritime services in the Gulf of Arabia, the Red Sea, the Mediterranean Sea, the Atlantic Ocean, and the Gulf of Mexico. (Pl.'s Compl. at 2–3 ¶ 1). In his position as a mooring master, Plaintiff was assigned by his employer to moor supertankers or vessels on the high seas for the purpose of onloading and offloading petroleum and other cargo. *Id.* at 3 ¶ 1.

Acomarit performs maritime services including managing supertankers, which oc-casionally requires onloading and offloading of petroleum. *Id.* at 3 ¶ 2.

On May 17, 1999, Plaintiff left the American Discovery, a vessel managed and operated by his employer, disembarked onto a tender vessel and then was placed aboard the S/T Marine Atlantic, a vessel managed by Acomarit, anchored approximately 60 miles off the coastline of Texas. *Id.* at 3 ¶ 3; Bille Aff. ¶ 3, Renewed Mot. Dismiss, Ex. 4. The Marine Atlantic, which weighs approximately 100,000 deadweight tons, with 400,000 tons of cargo-carrying capacity, is unable to enter American ports in the continental United States because the vessel's 75–foot draft exceeds the depth of domestic ports. (Bille Aff. ¶ 3, Renewed Mot. Dismiss, Ex. 4). After conducting preliminary inspections, Plaintiff got into a transfer basket attached to a hose crane, which was being used to lift him onto the tender vessel. (Pl.'s Compl. at 3 ¶ 3). While Plaintiff was inside the basket and the crane was transferring him to the tender vessel, the crane collapsed, and Plaintiff fell approximately fifty feet into the Gulf of Mexico. *Id.* Plaintiff claims that, although he jumped clear of the basket, he was lashed by the wire support cable of the crane, which broke off from its mount on the vessel and fell into the water with him. *Id.* He alleges that he suffered extensive injuries including a broken arm, nerve damage, broken ribs, injured lungs, as well as pain and suffering, and lost wages and income. *Id.* at 3–4 ¶ 4.

### B. *Procedural Background*

The instant case is one of several actions that Plaintiff has filed in connection with his May 17, 1999 accident against various defendants in the United States District Courts for the Southern District of Texas, Eastern District of New York, District of Maryland, and District of Columbia, and state courts in Texas and Wisconsin. Per-

sonal jurisdiction against Acomarit has not been established in the federal courts, and Plaintiff's Southern District of Texas action against Acomarit, the defendant in the instant case, was dismissed for lack of personal jurisdiction.[1] Plaintiff has appealed that decision to the United States Court of Appeals for the Fifth Circuit.

Plaintiff filed his original Complaint in the instant case in the Philadelphia Court of Common Pleas on May 16, 2001, claiming that jurisdiction was proper because Acomarit maintained an employee, Thomas Garrett ("Garrett"), a Nazareth, Pennsylvania[2] resident who allegedly carried out Acomarit's business from Pennsylvania. *Id.* at 1–2 ¶¶ 1–2. Count I states a claim for common-law negligence against Acomarit for failing to properly inspect and maintain the Marine Atlantic's crane, which failure was the proximate cause of his injuries. *Id.* at 4 ¶¶ 5–7. Count II states a claim against Acomarit for negligence under maritime law for failing to make the Marine Atlantic safe for Plaintiff's entry to perform the maritime operations for which he was hired. *Id.* at 5–6 ¶ 3. Plaintiff seeks $1 million in actual damages and $10 million in punitive damages. *Id.* at 6.

Acomarit timely removed to this Court based on diversity jurisdiction under 28 U.S.C. § 1332 and federal question jurisdiction pursuant to 28 U.S.C. § 1331, as the case involves admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333.

Plaintiff filed a Motion to Remand, which was denied, and Acomarit filed a Motion to Dismiss for Lack of Personal Jurisdiction, which was denied with leave to refile by July 30, 2002. Plaintiff then filed a Motion to Compel Answers to Admissions, Production of Documents, and Interrogatories, which was referred to a magistrate judge. The Motion was granted in part, but the magistrate judge ordered discovery limited to the time period of January 1, 1998 through the present and to jurisdictional contacts with Pennsylvania. Plaintiff's objections to the magistrate judge's order were the subject of a Memorandum Order, in which Plaintiff's objections were denied. *Saudi v. Acomarit Maritimes Services, S.A.,* No. Civ.A. 01–4301, 2002 WL 1373077, at *2 (E.D.Pa. June 24, 2002).

On July 25, 2002, Acomarit filed a Renewed Motion to Dismiss for Lack of Personal Jurisdiction, and Plaintiff took depositions and filed numerous discovery motions.

■■■ On October 18, 2002, this Court held a hearing on all pending motions. An Order followed granting Plaintiff's Motion to Extend Time to Take the Deposition of William Gibbs, a former employee of Osprey–Acomarit Ship Management ("Osprey–Acomarit"), a company which Plaintiff alleges was involved in a joint venture with Acomarit. The Court also allowed Plaintiff to file one more Motion to Compel the Production of Documents limited to

---

**1.** Plaintiff's first lawsuit concerning his accident was filed in the Southern District of Texas, where he sued Acomarit and what Plaintiff alleged was a joint venture between Acomarit and another company, called Osprey–Acomarit Ship Management, Inc. *Saudi v. S/T Marine Atlantic,* 159 F.Supp.2d 469, 475 (S.D.Tex.2001). Plaintiff also sued the owner of the Marine Atlantic, the manufacturer and servicer of the allegedly defective crane, and the owner of the crude oil being stored on the Marine Atlantic. *Id.* at 475.

Although the District Court reserved decision for additional discovery as to some of these defendants, it granted Acomarit's motion to dismiss, finding that Plaintiff had not proved personal jurisdiction as to Acomarit under the Texas long-arm statute, or under Fed.R.Civ.P. 4(k)(2). *Id.* at 483. As to the latter grounds, see discussion *infra* Part IV.D.

**2.** Nazareth is in the Eastern District of Pennsylvania.

Acomarit's jurisdictional contacts with Pennsylvania and to the time period of January 1, 1998 to May 17, 1999. The Court further ordered Plaintiff and Acomarit to file briefs discussing jurisdictional issues arising from Gibbs' deposition because of the several complaints relating to Plaintiff's injury filed in different district courts, and to file briefs regarding their respective positions on the first-filed rule and whether reference should be made to the Judicial Panel on Multi–District Litigation pursuant to 28 U.S.C. § 1407.[3]

## II. *Legal Standard*

Fed.R.Civ.P. 4(e) allows a district court to assert personal jurisdiction over a non-resident to the extent allowed by the law of the state in which it sits. *See Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 63 (3d Cir.1984). Pennsylvania's long-arm statute provides that a court may exercise personal jurisdiction over non-residents "to the fullest extent allowed under the Constitution of the United States." 42 Pa. Cons.Stat. Ann. § 5322(b).

Due process requires that the defendant have "minimum contacts" with the forum state, and that the exercise of jurisdiction comports with "traditional notions of fair play and substantial justice." *Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir.2001) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). "Minimum contacts must have a basis in 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Remick*, 238 F.3d at 255 (quoting *Asahi Metal Indus. Co., Ltd. v. Superior Court of California*, 480 U.S. 102, 109, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). When determining whether personal jurisdiction exists, the court must resolve the question based on the circumstances that the particular case presents. *Burger King*, 471 U.S. at 485, 105 S.Ct. 2174.

A court may exercise personal jurisdiction based on a defendant's general or specific contacts with the forum. General jurisdiction is based upon the defendant's "continuous and systematic contacts" with the forum. *General Elec. Co. v. Deutz Ag*, 270 F.3d 144, 150 (3d Cir.2001) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)). Specific jurisdiction is appropriate only if the "plaintiff's cause of action arises out of a defendant's forum-related activities, such that the defendant 'should reasonably expect being haled into court' in that forum." *Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prod. Co.*, 75 F.3d 147, 151 (3d Cir.1996) (quoting *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286,

---

**3.** The first-filed rule "gives a court 'the power' to enjoin the subsequent prosecution of proceedings involving the same parties and the same issues already before another district court." *E.E.O.C. v. University of Pennsylvania*, 850 F.2d 969, 971–72 (3d Cir.1988). The rule does not apply in the instant case because personal jurisdiction has not been established in the Southern District of Texas, where Plaintiff first filed his action, or in any other district. The "interest of justice is served" by transferring the case "to a district in which personal jurisdiction is clearly established." *Cherry Communications, Inc. v. Coastal Telephone Co.*, 906 F.Supp. 452, 455 n. 4 (N.D.Ill.1995). Additionally, the parties, jurisdictional contacts, and issues differ in each forum in which Plaintiff has sued. Therefore, the first-filed rule does not apply.

The statute governing multi-district litigation, 28 U.S.C. § 1407, would not apply until and unless Plaintiff establishes jurisdiction over one or more defendants in multiple districts, which has not yet occurred.

297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). Specific jurisdiction is established where the defendant "purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or relate[ ] to' those activities." *BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.*, 229 F.3d 254, 259 (3d Cir.2000) (quoting *Burger King*, 471 U.S. at 472, 105 S.Ct. 2174).

 In deciding a motion to dismiss for lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2), the allegations of the complaint are taken as true. However, once a jurisdictional defense is raised, the plaintiff bears the burden of proving, through affidavits, or competent evidence, sufficient contacts with the forum state to establish personal jurisdiction. *See Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1302 (3d Cir.1996), *cert. denied*, 519 U.S. 1028, 117 S.Ct. 583, 136 L.Ed.2d 513 (1996). The plaintiff must establish those contacts with reasonable particularity. *See Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992). Once the plaintiff makes out a *prima facie* case in favor of personal jurisdiction, the burden shifts to the defendant to establish that the presence of some other considerations would render jurisdiction unreasonable. *See Carteret Sav. Bank v. Shushan*, 954 F.2d 141, 150 (3d Cir.1992).

## III. *Discussion*

### A. *Parties' Contentions*

Acomarit summarized its contentions that it is not subject to personal jurisdiction in this District at the hearing as follows:

MR. NORK: Acomarit is ... an international ship management company. It's one of the biggest ship management companies in the world and it's a collection of ... men and women over in Geneva who have contracted with ship owners all around the world, and they operate these ships.

They insure their crewing, their provisioning, and that they are maintained and get from "A" to "B." And that's what Acomarit does. And it—its hub is in Geneva, and it controls ships around the world. It doesn't do that business here in Pennsylvania. In fact, in the time window that we're looking at for discovery here, one ship and only one ship managed by Acomarit made I think a day-and-a-half, two day port call to discharge oil ... in 2000.

So as a practical matter, ... this company doesn't do business in this state. Which leads us to Tom Garrett.... He sailed primarily on tankers, and he is an expert on tanker operations, and the regulatory work that controls those ships....

Tom Garrett's job ... was to work on ships. Go to ships around the world, go to ships in U.S. ports, and inspect, audit ...

He never once did that in Pennsylvania. He never once boarded a ship operated by Acomarit or anyone else in Pennsylvania. He has never done business in Pennsylvania. He hasn't solicited business, hasn't entered into contracts, hasn't marketed Acomarit's business, or anyone else's business. He hasn't injected himself, or through him Acomarit, into the commerce of this state. He simply lives here....

And what if he did send a few reports from his home, and had a few phone calls and e-mails to and from his home directly to Acomarit.... It's not substantial, and it's not continuous. Really, in essence, his living in Pennsylvania is fortuitous.

(Hearing Tr. at 33–36).

Acomarit's contract with Marine Atlantic, Ltd., the owner of the Marine Atlantic,

to manage the vessel was not negotiated in Pennsylvania, neither entity being a Pennsylvania corporation, and the contract did not require performance in Pennsylvania. (Bille Aff. ¶ 4, Renewed Mot. Dismiss, Ex. 4). Acomarit is not registered or authorized to conduct business in Pennsylvania, nor does it maintain an agent for service of process in the state. *Id.* ¶ 2. Acomarit has never maintained a bank account, mailing address, or telephone listing in Pennsylvania, has not paid any Pennsylvania taxes, has not acquired or purchased goods or materials from sources located in Pennsylvania, has not advertised in any publications distributed in Pennsylvania, and does not own or lease any real property here. *Id.*

Plaintiff's primary argument for contending that Acomarit is subject to personal jurisdiction in this District is based on the activities of Pennsylvania resident Garrett, whom Plaintiff alleges worked for Acomarit:

> MR. SAUDI: [A]ny contact that [Garrett] started in the [Eastern] District of Pennsylvania, to go—let us say he received a phone call to go to a ship in South Africa. That's considered to be a jurisdiction for Pennsylvania. If he comes back again, and put a report in his computer about what did he do in district, that's basically a connection with Pennsylvania.
>
> If he makes a phone call or fax, if he takes any instructions from here to go and make a tour for two or three months and come back again, that is a connection with Pennsylvania. . . .
>
> That was where he would receive fax. That was he—where he might be able to send some documents to them. This is where he was working from . . . .
>
> We consider him employee of Acomarit, period. So there is an acid test that shows up jurisdiction if he's an employ-

ee. Part of it are (sic) who pays him? Now if he's paid—and allow me to say under table—but if he's paid actually from Acomarit through Osprey Acomarit, he is an employee of Osprey Acomarit for doing nothing. . . .

> He is the agent because he takes [money] from Acomarit. He's reimbursed all his expenses for Acomarit. Even though he's working for other companies, it all rounds back to A[c]omarit, who's paying him. . . . And that's most of everything goes back and forth to Acomarit.

(Hearing Tr. at 53–55).

Plaintiff's allegations of Acomarit's jurisdictional contacts with Pennsylvania will be examined.

### 1. *Specific Personal Jurisdiction*

Plaintiff does not allege specific personal jurisdiction nor does the underlying accident implicate any action arising out of or relating to Acomarit's contacts with or activities in Pennsylvania, such that Acomarit "should reasonably expect being haled into court" in Pennsylvania. *Vetrotex,* 75 F.3d at 151 (quoting *World-Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. 559). Plaintiff's claims against Acomarit relate only to Plaintiff's May 17, 1999 accident, which occurred in the Gulf of Mexico, not in Pennsylvania or within its territorial waters. (Pl.'s Compl. at 3 ¶ 3). Plaintiff does not allege that Acomarit "purposefully directed" its activities at the forum or that his alleged injury arose from or is related to those activities. *Deutz Ag,* 270 F.3d at 150 (quoting *Burger King,* 471 U.S. at 472, 105 S.Ct. 2174). Therefore, the Court has no basis to exercise specific personal jurisdiction over Acomarit.

### 2. *General Personal Jurisdiction*

Plaintiff alleges that the Court should exercise general personal jurisdiction over

Acomarit. (Pl.'s Supp. Resp. Def.'s Mot. Dismiss at 15). Plaintiff's basis for general personal jurisdiction is summarized in his Complaint:

> During various times material to this Complaint leading up to Plaintiff's injury Acomarit Maritimes Services, S.A. maintained an employee, Thomas Garrett, who was a resident of the State of Pennsylvania. Thomas Garrett acted as a "port captain" for all of Acomarit Maritimes Services, S.A.'s vessels which Acomarit Maritimes Services, S.A. owned or managed and which were either stationed in the Gulf of Mexico, the Caribbean, or the Atlantic and Pacific Oceans contiguous with the coastlines of the United States of American [sic] or made port calls in the United States and Central America. Thomas Garrett was an employee of Acomarit whom Acomarit maintained and stationed in the State of Pennsylvania to carry out the business of Acomarit, including, but not limited to the attending, provisioning, and inspection, of Acomarit-owned and managed vessels.

(Pl.'s Compl. at 1–2 ¶ 2).

Pursuant to prior rulings of this Court, Plaintiff was allowed to pursue discovery on jurisdictional contacts with Pennsylvania from January 1, 1998 to the present. During the extensive jurisdictional discovery that has occurred in this action, Plaintiff has deposed the following people: Thomas Garrett; J. William Charrier, president of American Automar, Inc., a partner in an alleged joint venture with Acomarit; Janet Saedi, president of Osprey Ship Management; and William Gibbs, former president of Osprey–Acomarit during Garrett's employment there. (Pl.'s Second Supp. Resp. Def.'s Mot. Dismiss at 1–2). Acomarit has also turned over correspondence between Captain Jacques Bille, Acomarit's general manager and authorized agent, and Garrett during the relevant jurisdictional period. (Def.'s Renewed Mot. Dismiss Exs. 7A–E). Based on these discovery materials, Plaintiff alleges that general personal jurisdiction is appropriate in this Court. This information will now be discussed.

### 3. Acomarit's Alleged Contacts with Pennsylvania

The following summarizes Plaintiff's evidence of Acomarit's jurisdictional contacts with Pennsylvania.

### a. Plaintiff Contends Osprey–Acomarit Was a Joint Venture Between Defendant Acomarit and American Automar, Inc.

In 1994, shortly after Tom Garrett began working for Osprey Ship Management, the wholly-owned subsidiary of American Automar, Inc., which owns a fleet of ships, Acomarit Holdings Limited purchased a minority interest in Osprey Ship Management, becoming a co-owner of the company along with American Automar. (Bille Aff. ¶ 5, Renewed Mot. Dismiss, Ex. 4; Saedi Dep. at 9–16, Pl.'s Supp. Resp. Def.'s Renewed Mot. Dismiss, Ex. BB). The new company was called Osprey–Acomarit Ship Management. Osprey–Acomarit, which operated in Bethesda, Maryland, was supposed to provide ship management services for American Automar's fleet of ships. *Id.* at 11–12.

Plaintiff cites to Gibbs' deposition to support his assertion that Osprey–Acomarit was formed as a result of Acomarit entering into what the parties colloquially refer to as a "joint venture" with American Automar to pursue the business of ship management. (Pl.'s Second Supp. Resp. Def.'s Mot. Dismiss at 3). However, the deposition testimony does not support this contention:

Q. January 1998, American Automar was under an agreement with some

entity which have b[r]ought up Aco-marit—Osprey–Acomarit Ship Management; is that correct—

A. Yes.

Q. —1998?

A. Yes.

Q. Would you tell me who was American Automar is in agreement with at that time?

A. Acomarit Holdings Limited of Bermuda.

\* \* \* \* \* \*

Q. What business did the joint venture have been conducted, sir?

A. Ship management.

Q. Solely for ship management, right?

A. Yes.

Q. And where did this joint venture conduct business?

A. Bethesda, Maryland.

(Gibbs Dep. at 14, 19, Def.'s Reply. Pl.'s Second Supp. Resp. Def.'s Mot. Dismiss, Ex. 2).

This testimony does not implicate any contacts with Pennsylvania and shows only that American Automar entered into an agreement with Acomarit Holdings Limited of Bermuda[4] to form Osprey–Acomarit. It does not support the existence of any agreement between American Automar and Defendant Acomarit.

Plaintiff further refers to a December 15, 1998 letter from J. William Charrier, American Automar's president, to Giorgio Sulser of Acomarit in Geneva, Switzerland, terminating the agreement between American Automar and Acomarit Holdings Limited. (Pl.'s Aff. Opp. Def.'s Mot. Dismiss Ex. 3). The letter states that "American Automar (AAI) will repurchase Acomarit Holdings' (AHL) shares in Osprey–Acomarit Ship Management (OASM) for a total consideration of [redacted amount] in cash plus Automar's shares representing a 49% interest in Acomarit North America (ANA). AAI and AHL agree that ANA is presently inactive and its shares have no value." *Id.* The letter also states:

OASM will continue to employ [redacted name][5] under the present arrangement rebilling all costs to Acomarit Geneva until May 31, 1999 unless instructed by Acomarit Geneva to terminate his employment at an earlier date. If requested by Acomarit Geneva or Acomarit (UK), OASM will enter into a further agreement to provide [redacted name] services to the Acomarit group on a cost reimbursable basis plus an administrative fee of $400 per month. Effective January 1, 1999 Acomarit Geneva will take over from OASM the advancing of expense funds in respect of [redacted name].

*Id.*

This letter does not implicate any contacts with Pennsylvania and shows only that American Automar terminated its agreement with Acomarit Holdings Limited. It does not support the existence of any agreement between American Automar and Defendant Acomarit.

b. **Plaintiff Contends Garrett's Employment with Osprey–Acomarit is Sufficient Because Garrett Resides in Pennsylvania**

Many of the details of Garrett's employment arrangement with Osprey–Acomarit,

---

4. Plaintiff has not established any relationship between Acomarit Holdings Limited of Bermuda and Acomarit Maritimes Services, S.A., the Swiss corporation defendant in the instant action.

5. The unredacted letter with Tom Garrett's name was provided to Plaintiff in discovery in his action in the Southern District of Texas. (Pl.'s Aff. Opp. Def.'s Mot. Dismiss Ex. 3.) At the October 18, 2002 hearing, defense counsel also said that Tom Garrett's name had been redacted from the letter. (Hearing Tr. at 62).

which lasted until Garrett left for another job in February 1999, can be gleaned from his affidavit:

In my work as port captain while employed by Osprey–Acomarit Ship Management, Inc., I conducted site visits to various Acomarit operated vessels, among other companies' vessels. I reside in Pennsylvania and traveled to and from the vessels wherever those vessels called. Approximately 60 to 70% of my work involved attending vessels outside of the United States, and 30 to 40% of my work involved attending vessels in the United States. I have no recollection of ever attending on behalf of Acomarit any Acomarit operated vessels in Pennsylvania waters. I used a lap top computer to prepare reports. In most cases, I prepared my reports while still aboard the vessel. In a small number of cases, I completed the preparation of my reports at home. I also occasionally received an e-mail, fax and telephone call relating to ship visits while at home. Around October, 1997, I was requested by a representative of a vessel owner to attend the installation of a Beam Extender on a vessel at layberth in Philadelphia, Pennsylvania. While Acomarit performed some functions with respect to the operation of that vessel, this work was performed by me on behalf of the vessel owner, not on behalf of Acomarit. Based on my knowledge of the circumstances, I do not believe that it was Acomarit who directed the vessel to Philadelphia.

(Garrett Aff. ¶ 3, Def.'s Renewed Mot. Dismiss, Ex. 3).

In his deposition, Gibbs explained how Garrett was paid and reimbursed for his services:

A. Tom Garrett would presumably submit invoices to Geneva and when those were approved by Captain Bille the approval would be faxed to Osprey and based on that approval we would pay or reimburse Tom Garrett for those expenses.

Q. So what you're telling me is supposedly whatever he bills he sent over to Acomarit in Geneva?

A. Whatever he billed he sent to Geneva.

Q. Do you receive a copy of those?

A. We would receive a copy, as I recall, of the—what I would call the cover sheet of the expense form and that would have a total at the bottom, and we would total the totals of perhaps five or six or seven at a time of different expense reports.

\*　　\*　　\*　　\*　　\*　　\*

Q. My understanding is that Captain Tom Garrett was usually paid by wire transaction for his salary; is that correct?

A. Well, I wouldn't call it a wire transfer. In American banking it would be called an electronic transfer, and ETF, as we all were.

Q. So it was an electronic transfer?

A. Yes, from the bank to the individual employee's bank account, if the individual employee so chose. It was at the option of the employee.

(Gibbs Dep. at 35–36; 39–40, Def.'s Reply. Pl.'s Second Supp. Resp. Def.'s Mot. Dismiss, Ex. 2)

This evidence, indicating that Garrett received payments by electronic funds transfer from Osprey–Acomarit to his Pennsylvania bank account, as well as reimbursement from Osprey–Acomarit, does not indicate any contacts between Acomarit and Pennsylvania.

### c. *Garrett's Inspection of Cranes on the Marine Atlantic*

Plaintiff also points to Garrett's inspections of the Marine Atlantic in the early part of 1997. (Pl.'s Second Supp. Resp. Def.'s Mot. Dismiss at 7). Garrett testified that he was aboard the Marine Atlantic several times while he was working for Osprey–Acomarit and inspected the cranes in "every mode possible" in early 1997 and found them to be working properly. (Garrett Dep. at 140–142, Def.'s Renewed Mot. Dismiss, Ex. 6). However, this information comes from Garrett's December 19, 2000 deposition in Plaintiff's lawsuit in the Southern District of Texas, (Def.'s Renewed Mot. Dismiss, Ex. 6), and Plaintiff concedes it is not admissible in the instant action. (Hearing Tr. at 47). Regardless, this deposition testimony does not indicate contacts between Acomarit and Pennsylvania.

### 4. *Additional Evidence Relating to Jurisdictional Contacts*

Pursuant to the magistrate judge's initial discovery order, Acomarit claims to have produced the documents in its possession that relate to Pennsylvania from the period of January 1, 1998 to the present. (Def.'s Renewed Mot. Dismiss, Exs. 7A–E). Few of these documents are in temporal proximity to Plaintiff's accident. One document relates to an Acomarit-managed vessel that called upon the Marcus Hook Terminal in Philadelphia nearly a year after Plaintiff's accident. *Id.* Exs. 7B, D. Another document relates to the non-Acomarit-managed vessel that Garrett attended in Philadelphia, which he discussed in his affidavit. *Id.* Ex. 7C. The vessel actually called upon Philadelphia on January 26, 1996, more than three years before Plaintiff's accident. *Id.*

Acomarit also has produced documents relating to Garrett's compensation and reimbursement exchanged between Osprey–Acomarit's Maryland office and Acomarit's office in Geneva. *Id.* Ex. 7A. None of these documents entered or left Pennsylvania. *Id.*

The only documents in temporal proximity to Plaintiff's accident that relate to Pennsylvania were exchanged between Acomarit and Garrett. The first was a fax sent by Captain Bille to Garrett at his home on January 10, 1998, which discussed reimbursement for Garrett's expenses. *Id.* There also was a three-page report letter faxed by Garrett to Captain Bille on April 12, 1998, relating to cellular telephone communications aboard the Front Highness, a ship Garrett had inspected. *Id.* Additionally, Acomarit produced fax cover sheets related to Garrett's expense reports sent by Captain Bille to Captain Gibbs. *Id.*

### B. *Legal Discussion*

In *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 410, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984), a helicopter accident in Peru killed American citizens, and the surviving relatives sued the defendant, a Colombian corporation, in Texas. The plaintiffs asserted that personal jurisdiction was proper because the defendant had purchased approximately 80 percent of its helicopters, spare parts, and accessories for more than $4 million from a helicopter company in Texas for seven years. *Id.* at 411, 104 S.Ct. 1868. Additionally, the defendant sent its prospective pilots to Texas for training and the defendant's management personnel visited the helicopter company in Texas. *Id.* Beyond these contacts, though, the defendant had no other business contacts with Texas. *Id.* It had never been authorized to do business in Texas, did not have an agent for service of process there, did not sell or solicit business in Texas, did not have em-

ployees in Texas, and did not own property or maintain an office in Texas. *Id.*

The Supreme Court found that general personal jurisdiction over the foreign defendant was not appropriate because:

> mere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of in personam jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions. Nor can we conclude that the fact that Helicol sent personnel into Texas for training in connection with the purchase of helicopters and equipment in that State in any way enhanced the nature of Helicol's contacts with Texas.

*Id.* at 418, 104 S.Ct. 1868.

The Third Circuit recently examined whether general personal jurisdiction was appropriate in *BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.,* 229 F.3d 254, 257 (3d Cir.2000), in which the plaintiff, BP, a British corporation, asserted in the United States District Court for the District of New Jersey federal claims related to the misappropriation of trade secrets against the defendants, Formosa Chemical, a Taiwanese corporation, and Joseph Oat, a Pennsylvania corporation with its principal place of business in New Jersey. BP alleged that Formosa Chemical, a subsidiary of a Taiwanese conglomerate known as Formosa Plastics Group, misappropriated trade secrets related to its process for making acetic acid by copying elements of a plant design that BP's predecessor had provided to a licensee and that Formosa Chemical and Joseph Oat had entered into a contract whereby Joseph Oat would fabricate in New Jersey a number of chemical process vessels and heat exchangers using misappropriated technical specifications for ultimate use in the construction of an acetic acid plant in Taiwan. *Id.* at 257. BP sought a prelimi-

nary injunction to prevent Joseph Oat and Formosa Chemical from exporting their vessels to Taiwan and from taking possession of any equipment manufactured in the United States by American companies using BP's trade secrets, and Formosa Chemical moved to dismiss for lack of personal jurisdiction. *Id.* The district court denied Formosa Chemical's motion to dismiss finding that the company did not have sufficient contacts with New Jersey to justify assertion of jurisdiction under the state's long-arm statute but that it did have sufficient contacts with the United States as a whole to justify jurisdiction under Fed.R.Civ.P. 4(k)(2). *Id.* at 258.

On appeal, the Third Circuit reviewed Formosa Chemical's contacts with the United States for the purpose of general personal jurisdiction. *Id.* at 262. Although Formosa Chemical exported its products to the United States, it did not have personnel or facilities in the United States and had not advertised or solicited American business. *Id.* Additionally, Formosa Chemical had an arrangement with Formosa Plastics Group, whereby Formosa Chemical leased software from it and would submit bid packages to Formosa Plastics' purchasing group, which would then submit those packages to the Taiwanese agents of United States vendors, who in turn would send them to their clients in the United States. *Id.* at 258, 263. The Court found that these contacts were not sufficient to pierce the corporate veil and assert jurisdiction over Formosa Chemical based on the American contacts of Formosa Plastics and its affiliates. *Id.* Further, the Court found that Formosa Chemical's 3.5 percent stock interest in a Delaware corporation with headquarters in New Jersey did not "constitute the kind of continuous and systematic business contacts that give rise to general jurisdiction." *Id.* at 263. Finally, the Court found the fact that

Formosa Chemical had entered into four recent contracts for the purchase of chemical technology, "two of which involved [Formosa Chemical] personnel traveling to the United States for training, is insufficient. *See Helicopteros* 466 U.S. at 416–17, 104 S.Ct. 1868, 80 L.Ed.2d 404 (visits in connection with training and purchases, even if occurring at regular intervals, are insufficient basis for general jurisdiction)." *Id.*

The Court concluded that "considering the cumulative effect of these various contacts together, the requirements for general jurisdiction are not met." *Id.* On the Court's decision to reverse the district court's finding that Rule 4(k)(2) jurisdiction over the defendant was proper, see discussion *infra* Part IV.D.2.c.

■ The above discussion clearly illustrates that because Acomarit's contacts with Pennsylvania were sporadic at best, they could in no way be seen as "continuous and systematic" contacts with Pennsylvania. *Id.* at 259 (quoting *Helicopteros,* 466 U.S. at 416, 104 S.Ct. 1868).

## IV. *Additional Arguments Raised by Plaintiff*

### A. *Borrowed Servant*

■ Plaintiff asserts that even though Garrett was paid by Osprey–Acomarit that Acomarit controlled Garrett's activities, implicating the borrowed servant doctrine. (Pl.'s Second Supp. Resp. Def.'s Mot. Dismiss at 8). He cites to a case, *Total Marine Services, Inc. v. Director, Office of Worker's Compensation Programs, U.S. Dep't of Labor,* 87 F.3d 774 (5th Cir.1996), for the proposition that a worker may be in the general service of another, but that when his work is transferred with his consent or acquiescence to a third party, he becomes the servant of that third party with all the legal consequences of that

relationship. *Id.* However, even if this were true in the instant case, Garrett's activities in Pennsylvania, as discussed above, are not sufficient to exercise general personal jurisdiction over Acomarit.

### B. *Joint Venture*

Plaintiff asserts that Osprey–Acomarit and Acomarit entered a joint venture to disguise Acomarit's business affairs carried out by Garrett, its alleged Pennsylvania agent. (Pl.'s Second Supp. Resp. Def.'s Mot. Dismiss at 8). However, Plaintiff has not offered any proof of this alleged joint venture, and indeed the only agreement regarding Osprey Acomarit's formation is between American Automar and Acomarit Holdings Limited of Bermuda. (Gibbs Dep. at 14–16, Def.'s Reply Pl.'s Second Supp. Resp. Def.'s Mot. Dismiss, Ex. 2). Plaintiff has not offered any proof that Acomarit has engaged in any activity in Pennsylvania. All that he has demonstrated has been acknowledged by Acomarit: Garrett resided in Pennsylvania, where he received compensation and reimbursement for expenses; Garrett, while at his home, occasionally sent and received faxes, E-mails, and telephone calls regarding his employment; and Garrett traveled to and from Pennsylvania to attend vessels out of state. (Def.'s Renewed Mot. Dismiss at 14). Plaintiff's bald assertion that Acomarit engaged in a scheme to destroy all of its records reflecting its activities in the United States is not supported by any evidence. *Id.* at 8–9. Plaintiff has had a full opportunity for discovery in which to attempt to prove such an allegation, but he has failed to present any evidence supporting this bare claim.

### C. *Vice Principal*

Plaintiff claims that "[w]here a representative or one acting on behalf of a

corporation has authority to direct, supervise, hire, and discharge subordinates, he becomes a vice principal of that corporation." *Id.* at 9–10. Plaintiff contends that Osprey–Acomarit, through Garrett, was a "vice principal" for Acomarit and that Osprey–Acomarit's activities establish jurisdiction over Acomarit. *Id.* at 9. It appears that Plaintiff intends to use the term "agent" or "subagent." A "principal" authorizes an agent to act on his or her behalf, and an agent may appoint a subagent to perform agency-related duties. Restatement (Second) of Agency §§ 1, 5 (1958); Black's Law Dictionary 64, 65, 1210 (7th ed.1999).

Regardless of the terminology, Plaintiff cites no evidence to support his allegation. Instead, he refers to a case, *Prunty v. Arkansas Freightways, Inc.*, 16 F.3d 649 (5th Cir.1994), for the proposition that the acts of a vice principal are jurisdictionally attributable to the principal corporation. *Prunty*, which involved alleged sexual harassment by a company supervisor, actually stands for the principle that an employer who ratifies or approves the intentional, malicious, or grossly negligent acts of an agent may be liable for compensatory and punitive damages. 16 F.3d at 652–53. Plaintiff's reliance on this case is inapposite.

### D. *Plaintiff's Allegation of Rule 4(k)(2) Jurisdiction*

#### 1. *Proceedings in the Southern District of Texas*

 In his lawsuit in the Southern District of Texas, Plaintiff argued that Acomarit was amenable to that court's jurisdiction based on the Texas long-arm statute and pursuant to Fed.R.Civ.P. 4(k)(2).[6] After reviewing Plaintiff's allegations of Acomarit's contacts,[7] that court rejected Plaintiff's contentions:

> [Plaintiff] points to the numerous economic relationships and contract between Acomarit and Texas and the litigation listed above as minimum contacts, demonstrating that Acomarit has engaged in purposeful activity in the Unit-

---

**6.** Fed.R.Civ.P. 4(k)(2) provides:

If the exercise of jurisdiction is consistent with the Constitution and the laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

Professor Coyne explains the rule:

The provision functions as a species of federal long arm statute by closing the loophole that existed when foreign defendants lacked single state contacts sufficient to bring them within the reach of a given state's long arm statute, but had enough contacts with the United States as a whole to make personal jurisdiction over them in a United States court constitutional.... A federal court may use this rule where a defendant contends that he or she cannot be sued in the forum state and refuses to identify any other state where suit against him or her is possible.

Thomas A. Coyne, Federal Rules of Civil Procedure II 25 (2d ed.2002) (citations omitted). *See also* Dora A. Corby, Comment, *Putting Personal Jurisdiction Within Reach: Just What Has Rule 4(k)(2) Done for the Jurisdiction of Federal Courts?* 30 McGeorge L.Rev. 167 (1998).

**7.** Plaintiff's list of Acomarit's contacts included allegations that the Marine Atlantic, under Acomarit's management, was conducting its operations within the business and economic zone of the United States; that the support vessels for the Marine Atlantic were registered in the United States; that the company whose crude oil was stored on the Marine Atlantic hired a Texas company to provide lightering services for the Marine Atlantic; and that some of Acomarit's vessels had entered the United States to conduct business. *Saudi v. S/T Marine Atlantic*, 159 F.Supp.2d at 479, 483.

ed States and invoked the benefits and protections of its laws. He insists that Acomarit has continuous and systematic contacts with both the United States and Texas. He points to the three-factor test frequently used for sufficiency of minimum contacts for general jurisdiction to exercise personal jurisdiction under Rule 4(k)(2): (1) transacting business in the United States; or (2) doing an act in the United States; or (3) having an effect in the United States by an action done elsewhere. *Western Equities, Ltd. v. Hanseatic, Ltd.*, 956 F.Supp. 1232, 1237 (D.Vi.1997), *citing Eskofot A/S v. E.I. Du Pont De Nemours & Co.*, 872 F.Supp. 81, 87 (S.D.N.Y.1995). Saudi asserts that Acomarit has continuous and systematic contacts with the United States and with Texas and that therefore the Court can assert general personal jurisdiction over Acomarit under Rule 4(k)(2).

\* \* \* \* \* \*

Regarding his allegations that the vessel was located in the "water body of Texas"

in an "exclusive business and economic zone" of the United States, Acomarit states that it has found no statute, regulation or federal or Texas case that uses these terms and charges that they are unfounded and lacking in any legal authority. The bottom line is that the Marine Atlantic was in international waters at the time of the incident, and thus the incident did not occur in Texas, in Texas waters, or within Texas' jurisdictional reach. This Court agrees that the terminology employed by Saudi fails to obfuscate the fact that the location of the accident was not in Texas or United States waters to create a nexus with the forum or generally with the United States.

\* \* \* \* \* \*

[T]he Court agrees with Acomarit that the points [Plaintiff] argues do not constitute sufficient minimum contacts to Texas or to the United States [to] impose jurisdiction on Acomarit in the instant suit.[8]

---

**8.** In its ruling, the Southern District of Texas noted that Plaintiff's argument that Acomarit had sufficient contacts with both Texas and the United States to satisfy Rule 4(k)(2) jurisdiction contradicted his own authority that federal long-arm jurisdiction under Rule 4(k)(2) is not an option where the party's minimum contacts satisfy a state long-arm statute. *Saudi v. S/T Marine Atlantic*, 159 F.Supp.2d at 480 n. 5. However, a plaintiff may allege alternative theories of jurisdiction and may introduce evidence of a defendant's contacts with one state to attempt to prove jurisdiction under that state's long-arm statute, and may also attempt to prove general contacts with many states in an effort to prove Rule 4(k)(2) nationwide jurisdiction is applicable. Rule 4(k)(2) does not preclude alternative theories, but does not allow the court to find both federal long-arm jurisdiction under Rule 4(k)(2) and jurisdiction under a state's long-arm statute. *See* Gary B. Born & Andrew N. Vollmer, *The Effect of the Revised Federal Rules of Civil Procedure on Personal Jurisdiction, Service, and Discovery in*

*International Cases*, 150 F.R.D. 221, 226 (1993) ("[A] plaintiff will not have the benefit of the national contacts test unless it identifies all the states in which the defendant has some contacts, analyzes the long-arm statute of each of those states, researches the judicial decisions applying the statutes, and properly concludes that none of the statutes would permit the state to exercise personal jurisdiction over the defendant."). These authors, although noting that the rule is designed to help plaintiffs, nonetheless note that if a plaintiff cannot identify a federal district court in a state with a long-arm statute that would reach the defendant:

the clause seems destined to foment costly, time-consuming, superfluous, and distracting litigation about a defendant's amenability to jurisdiction in different states. In an anomalous turnabout, those disputes would involve plaintiffs arguing that defendants are not subject to jurisdiction under any state long-arm statute and defendants arguing that they are and that the litigation is in the wrong state.

*Saudi v. S/T Marine Atlantic,* 159 F.Supp.2d 469, 480 (S.D.Tex.2000).

### 2. *Proceedings in the Eastern District of Pennsylvania*

Plaintiff alleged Rule 4(k)(2) jurisdiction for the first time in this Court in his objection to the magistrate judge's March 12, 2002 Order, which limited Plaintiff's discovery to Acomarit's alleged contacts with Pennsylvania from January 1, 1998 to the present. Plaintiff asserted that he should be "entitled to full discovery of all of Tom Garrett's (Acomarit's agent's) nationwide activities since Saudi never had a full and fair opportunity to litigate nationwide jurisdiction over Defendant Acomarit under Rule 4(k)(2) [of the] Federal Rules of Civil Procedure." (Pl.'s Aff. Obj. Magistrate's Order at 3). Plaintiff asserted that:

> The Magistrate's view is erroneous for two reasons. When Garrett, who lived in Pennsylvania the whole time he was "attending" Acomarit vessels, was dispatched from Pennsylvania by order of Defendant Acomarit, and when he returned to Pennsylvania, Garrett's actions took place "partly" in that state and constitute part performance of his employment contract therein. Additionally, when Defendant Acomarit contacted Garrett, by mail or by telephone, or by other means, while Garrett was located in that state, such acts "directed at" or "within" the State of Pennsylvania are relevant to jurisdiction.

*Id.*

On June 24, 2002, this Court denied Plaintiff's objections to the magistrate judge's Order. *Saudi v. Acomarit Maritimes Services, S.A.D.,* 2002 WL 1373077, at *2:

Saudi appears to be intent upon reopening the issue of national jurisdiction previously resolved in the Texas litigation.... An essential prerequisite to applying Rule 4(k)(2) is that a defendant is not subject to jurisdiction in any state. *Base Metal Trading, Ltd., v. OJSC,* 283 F.3d 208, 215 (4th Cir.2002). Saudi, however, now asserts that Acomarit is subject to personal jurisdiction and service in Pennsylvania. The Court ordered discovery to determine whether that contention was correct. If Saudi is correct, he can not satisfy an essential element of national jurisdiction and [the] Magistrate Judge [ ] properly limited discovery to Acomarit's Pennsylvania contacts.

*Id.* at *1. Assuming that Plaintiff did not waive his Rule 4(k)(2) argument by failing to assert it prior to the magistrate judge's ruling, the discussion below will show that he has not been prejudiced by any restrictions on discovery.

### a. *Res Judicata/Claim Preclusion*

 Acomarit contends that the Texas court's determination that it did not have Rule 4(k)(2) jurisdiction serves as *res judicata* or claim preclusion to bar the relitigation of that claim in this case. (Def.'s Reply. Pl.'s Second Supp. Resp. Def.'s Renewed Mot. Dismiss at 6).

Plaintiff asserts that the holding of the court in the Southern District of Texas that it did not have Rule 4(k)(2) jurisdiction should not serve as *res judicata* in this Court because Plaintiff was denied the full and fair opportunity to litigate that claim "based on misrepresentations of the opposing party."[9] (Pl.'s Mem. Law. Obj. Magistrate's Order at 2).

---

*Id.* at 227. *See also United States v. Offshore Marine Ltd.,* 179 F.R.D. 156, 157–59 (D.Vi. 1998) (holding that no basis existed for personal jurisdiction after reviewing the plaintiff's alleged contacts pursuant to the territory's long-arm statute and Rule 4(k)(2)).

**9.** Plaintiff characterizes as a misrepresentation Acomarit's assertion in its Motion to Dis-

"Federal law of claim preclusion requires a defendant to demonstrate that there has been a(1) final judgment on the merits in a prior suit involving (2) the same parties or their privies and (3) a subsequent suit based on the same cause of action." *Merritt Logan, Inc. v. Fleming Foods of Pennsylvania, Inc.*, 138 B.R. 15, 23–24 (E.D.Pa.1992) (quoting *Lubrizol Corp. v. Exxon. Corp.*, 929 F.2d 960, 963 (3d Cir.1991)). A dismissal of an action for lack of personal jurisdiction is not a dismissal on the merits. *See* Fed.R.Civ.P. 41(b) ("Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a *dismissal for lack of jurisdiction*, for improper venue, or for failure to join a party under Rule 19, operates as an adjudication on the merits.") (emphasis added); *see also Compagnie des Bauxites de Guinee v. L'Union Atlantique S.A. d'Assurances*, 723 F.2d 357, 360 (3d Cir.1983). Therefore, Acomarit's dismissal for lack of personal jurisdiction in the Southern District of Texas is not *res judicata* on this Court.

b. *Admission*

Acomarit also asserts that Plaintiff, pursuant to Fed.R.Evid. 801(d)(2)[10], is bound by his judicial admission that Rule 4(k)(2) jurisdiction in the Southern District of Texas was proper because Acomarit had insufficient contacts with any state to warrant the exercise of personal jurisdiction. (Def.'s Renewed Mot. Dismiss at 17, 18).

miss in the Southern District of Texas action that it had no employees in the United States. (Pl.'s Aff. Obj. Magistrate's Order at 5). However, Plaintiff has never established that Tom Garrett was an employee of Acomarit. Rather, Acomarit has characterized Garrett as a consultant providing services to a variety of ship operating groups and as an independent contractor. (Bille Aff. ¶ 5, Renewed Mot. Dismiss, Ex. 4; Hearing Tr. at 36).

"Judicial admissions are binding for the purpose of the case in which the admissions are made including appeals." *Zapach v. Dismuke*, 134 F.Supp.2d 682, 693 (E.D.Pa.2001) (quoting *Glick v. White Motor Co.*, 458 F.2d 1287, 1291 (3d Cir. 1972)). What Acomarit characterizes as an admission was more of a contention in the Southern District of Texas and not in the instant case, and was rejected by that court. Even assuming Plaintiff made an admission in that case, it is not binding on him in this Court. Further, Acomarit's position is inconsistent with general rules of federal pleading, which allow alternative theories to be presented. *See* Fed. R.Civ.P. 8.

c. *Legal Discussion Regarding Rule 4(k)(2)*

In *Western Equities, Ltd. v. Hanseatic, Ltd.*, 956 F.Supp. 1232, 1237 (D.Vi. 1997), cited in the Southern District of Texas opinion granting Acomarit's motion to dismiss, *Saudi v. S/T Marine Atlantic*, 159 F.Supp.2d at 480, 483, the District Court of the Virgin Islands, adopted the Second Circuit's test for the sufficiency of minimum contacts for the exercise of personal jurisdiction under Rule 4(k)(2), which requires that (1) the defendant transact business in the United States, or (2) do an act in the United States; or (3) have an effect in the United States by an act done elsewhere. In *Western Equities*, the plaintiff, a Channel Islands corporation which owned a British-registered yacht

10. Fed.R.Evid. 801(d)(2) provides, in relevant part, that a statement is not hearsay if the "statement is offered against the party and is (A) the party's own statement, in either an individual or representative capacity.... The contents of the statement shall be considered...."

used for charters, sued the defendants, another Channel Islands corporation, and its British-registered yacht, which allegedly crashed into the plaintiff's yacht in Antigua, West Indies, causing hull damage and lost charter revenue. 956 F.Supp. at 1233–34. The defendant filed a motion to dismiss for lack of personal jurisdiction, and the plaintiff asserted that jurisdiction was proper under Rule 4(k)(2). *Id.* at 1234. The parties agreed that the defendants were not subject to the jurisdiction of any state court of general jurisdiction in the United States, and the defendants asserted that they did not systematically conduct business in the United States. *Id.* To support its allegation of Rule 4(k)(2) jurisdiction, the plaintiff cited numerous visits by the defendant yacht to American ports; the defendants' attempts to sell the yacht through a broker in the United States; the defendants' advertising charter services in magazines circulated in the United States; and the defendants' solicitation of yacht brokers in the United States to arrange charters. *Id.* at 1236–37. The court reviewed these alleged contacts and found that they were not sufficient minimum contacts to exercise Rule 4(k)(2) jurisdiction because: (1) there was no evidence to show that the defendants had transacted business in the United States; (2) the alleged accident occurred in Antigua, West Indies; and (3) there was no allegation that the actions giving rise to the lawsuit would have any effect in the United States. *Id.* at 1237–38. "[E]ven if some effect could be found, it would hardly be foreseeable that the defendants should expect to answer for such effect in the courts of the United States. *See, e.g., SEC v. Unifund SAL,* 910 F.2d 1028, 1033 (2d Cir.1990)." *Id.* at 1238. Therefore, the court granted the defendants' motion to dismiss for lack of personal jurisdiction. *Id.* at 1239.

In *BP Chemicals,* 229 F.3d at 258, discussed *supra* Part III.B., the Third Circuit reversed the district court's ruling that the foreign defendant corporation had sufficient contacts with the United States as a whole to justify the exercise of Rule 4(k)(2) jurisdiction. The Court found that although the defendant Taiwanese corporation exported its products to the United States, held an ownership interest in a Delaware corporation, and entered into contracts requiring its personnel to travel to the United States for training, that the cumulative effects of these contacts did not meet the requirements for general personal jurisdiction under Rule 4(k)(2). *Id.* at 258, 262–63.

This Court concludes that the Southern District of Texas court's holding that Rule 4(k)(2) jurisdiction is not proper because the "location of the accident was not in Texas or United States waters to create a nexus with the forum or generally with the United States[,]" *Saudi v. S/T Marine Atlantic,* 159 F.Supp.2d at 480, is correct, and follows that holding.[11] Further, it is consistent with the holdings in *Western Equities* and *BP Chemicals.* Thus, even if the magistrate judge and the ruling on objections was too strict in the prior discovery rulings in this case, no amount of discovery on the activities of Acomarit generally, or Mr. Garrett, would be relevant. Jurisdiction under Rule 4(k)(2) is not available where the accident took place

---

**11.** The court also wrote:

> Finally, for jurisdiction under Rule 4(k)(2), Acomarit asserts that Saudi's "laundry list" of "contacts" fails to satisfy due process requirements. Acomarit notes that the analysis in *Western Equities* of the insufficiencies of Hanseatic Ltd.'s United States' contacts, shows they far exceed those imputed to Acomarit by Saudi. 956 F.Supp. at 1236–37.
>
> *Saudi v. S/T Marine Atlantic,* 159 F.Supp.2d at 483.

outside the United States, and had no effect inside the United States.

## V. *Motion to Compel*

Plaintiff filed a Motion to Compel on December 5, 2002, specifically seeking responses to Interrogatory Nos. 3, 5, 6, 14, and 16 and Requests for Production Nos. 3–9, 14, 15, 17, 24b, 25, 27, and 28. (Pl.'s Mot. Compel at 2, 7).

Acomarit responded to Plaintiff's Motion to Compel on December 17, 2002. In its response, Acomarit addressed each of Plaintiff's contentions. (Def.'s Resp. Pl.'s Mot. Compel at 3–13). With respect to Plaintiff's request for responses to Interrogatory Nos. 3, 5, 6, 14, and 16, Acomarit correctly noted that those requests exceed the scope of the Court's October 18, 2002 Order, which permitted Plaintiff to file one Motion to Compel the Production of Documents limited to Acomarit's jurisdictional contacts with the Pennsylvania from January 1, 1998 to May 17, 1999. *Id.* Ex. 2. However, Acomarit noted that it has previously responded to these interrogatories. *Id.* at 4.

Regarding Plaintiff's specific requests for documents, Acomarit noted that it has responded to all such requests and provided all of its responsive documents to Plaintiff. *Id.* at 5–13; Exs. 2–4. Where such documents were in its possession and within the scope of the Court's Order, Acomarit represents it has provided such documents. *Id.* In all other cases, it has answered such questions "none." *Id.;* Hearing Tr. at 44.

Despite his insistence that Acomarit has not produced documents in its possession, Plaintiff has not produced any evidence to prove that Acomarit is withholding documents. The Court concludes that on the record of the case, Acomarit has complied with Plaintiff's discovery requests and produced documents responsive to those requests. Therefore, Plaintiff's Motion to Compel will be denied.

## VI. *Conclusion*

For the reasons discussed above, Defendant Acomarit's Renewed Motion to Dismiss for Lack of Personal Jurisdiction will be granted.

An appropriate Order follows.

## *ORDER*

AND NOW, this 31st day of January, 2003, upon consideration of Defendant's Renewed Motion to Dismiss For Lack of Personal Jurisdiction (Doc. No. 31), and all responses and replies thereto, it is hereby ORDERED that:

1. Defendant's Motion is GRANTED without prejudice.

2. Plaintiff's Motion to Compel (Doc. No. 62) is DENIED.